Kenneth J. TARR, Plaintiff,

v.

CREDIT SUISSE ASSET MANAGEMENT, INC., Swiss American Corporation, Swiss American Securities, Inc., Credit Suisse, Hans Peter Sorg, Jorge Schwarzenbach, Frank Meister, George Helwig and John Does I through V, Persons and/or entities who cooperated and/or participated in the wrongs alleged herein, but are as yet unidentified, Defendants.

No. 95 CV 1857(FB).

United States District Court,
E.D. New York.

April 11, 1997.

Elliot Louis Pell, P.A., New York City, Law Offices of William J. Lanigan, Somerville, NJ, for Plaintiff.

Winthrop, Stimson, Putnam & Roberts by Susan J. Kohlman, Francis Carling, Michael A. Kalish, Armen H. Merjian, New York City, for Defendants.

## MEMORANDUM AND ORDER

BLOCK, District Judge:

The Court previously referred to Magistrate Judge Robert Levy for a report and recommendation ("R & R") defendants' motion to dismiss for failure to state a claim which sought dismissal of the complaint with the exception of its Title VII claim against defendant Credit Suisse Asset Management ("CSAM"). Defendants have submitted objections ("Objections") to the R & R issued by Magistrate Judge Levy on March 21, 1997.

The Court has considered plaintiff's objections and conducted a *de novo* review of the R & R. Fed.R.Civ.P. 72(b); *see also United States v. Premises Known as 281 Syosset Woodbury Road,* 862 F.Supp. 847, 851 (E.D.N.Y.1994) (magistrate judge's ruling on dispositive matters subject to *de novo* review). The Court adopts the extremely thorough, thoughtful, and well-reasoned R & R, with the exception that plaintiff may proceed in its Title VII claim against defendant Credit Suisse as well as defendant CSAM.

**SO ORDERED.**

## REPORT AND RECOMMENDATION

LEVY, United States Magistrate Judge.

By order dated December 10, 1996, the Honorable Frederic Block, United States District Judge, referred the above-captioned

matter to me to file a Report and Recommendation on all outstanding motions. Defendants Credit Suisse Asset Management, Inc. ("CSAM"), Swiss American Corporation ("SAC"), Swiss American Securities, Inc. ("SASI"), Credit Suisse ("CS"), Frank Meister ("Meister"), George Helwig ("Helwig"), Hans Peter Sorg ("Sorg") and Jorge Schwarzenbach ("Schwarzenbach") move to dismiss plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1] For the reasons stated below, I respectfully recommend that defendants' motions be granted.

## BACKGROUND AND FACTS

Plaintiff Kenneth J. Tarr commenced this action in May 1995. The facts alleged in plaintiff's 242–paragraph complaint are as follows:

Plaintiff is a former president and director of defendant CSAM, a New York corporation engaged in the business of money management for high net worth individuals and an "affiliate" of defendant CS.[2] On October 1, 1993, CSAM terminated plaintiffs employment. Plaintiff alleges a variety of claims in connection with his employment and termination, including claims for employment discrimination under Title VII, violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), conspiracy to violate RICO, breach of contract, prima facie tort, and intentional infliction of emotional distress.

Plaintiff alleges that, prior to his employment, all of the defendants entered into a fraudulent scheme "to increase the number and size of tax avoidance accounts of American taxpayers, *i.e.*, bank accounts and investment accounts in Switzerland and other offshore locations owned by individuals who wish to avoid the tax consequences associated with the funds deposited in those accounts." According to plaintiff, the scheme included "the hiring of an American citizen with superior credentials ... to provide defendant CSAM with instant credibility," as well as "the exercise of coercion and the imposition of punitive measures ... on employees who refused to allow [CSAM] to act in a manner contrary to United States law" and "the use of a scapegoat if defendant CSAM's business practices came under scrutiny."

Plaintiff claims that before CSAM recruited him, he was employed for fourteen years by The Bessemer Trust Companies ("Bessemer"), where he handled client portfolios worth 1.6 billion dollars. In the spring of 1991, while plaintiff was working for Bessemer in Florida, an executive recruiter approached him on behalf of CSAM. Plaintiff later participated in meetings with various individuals, including defendants Schwarzenbach, Helwig and Sorg and a Vice President of Korn/Ferry International named Howard Freedman[3], who allegedly misrepresented to plaintiff that CSAM "had state of the art computer systems, excellent staff, and a developed, integrated organization," overstated CSAM's assets under management, and deliberately failed to disclose to plaintiff that CSAM was "a skeletal, start-up company," that it "had a poor financial situation and a lack of systems" and that its "money management infrastructure only existed in rudimentary form." The complaint states that defendants Sorg, Schwarzenbach and Helwig knew that these representations were false and made them, individually and on behalf of defendants CSAM and CS, with the intent that plaintiff rely upon them.

By letter dated July 9, 1991, Schwarzenbach and Helwig allegedly sent plaintiff a written offer of employment containing various terms and conditions, including plaintiff's proposed salary. According to plaintiff, that letter constituted a use of the United States mails in furtherance of defendants' fraudulent scheme and thus "constituted mail fraud

1. Defendant CSAM has not moved to dismiss plaintiff's first claim for relief.

2. Other than describing defendant CSAM as an "affiliate" of defendant CS and a "wholly-owned subsidiary of defendant CS through defendant SAC," and alleging that defendants CSAM, SAC and SASI are "dominated and controlled" by defendant CS, the complaint fails to explain the corporate relationships, if any, among defendants CSAM, CS, SAC, and SASI.

3. Plaintiff's complaint does not name Mr. Freedman as a defendant. Nor does the complaint explain the legal relationship, if any, between Mr. Freedman and the named defendants.

in violation of 18 U.S.C. § 1341." Plaintiff further contends that, sometime after July 9, 1991, Freedman and defendant Schwarzenbach "represented to plaintiff that defendants, CS and CSAM, were making a long-term (at least five-year) commitment to plaintiff."

Based on the representations made to him, plaintiff accepted CSAM's offer of employment in mid-July 1991, resigned his position at Bessemer, and joined the company on August 19, 1991 as its President, Chief Investment Officer and a member of the Board of Directors. The complaint states that, at all relevant times, plaintiff "performed his responsibilities as President of defendant CSAM in an exemplary manner" and was responsible "for creating and building a successful investment management company" despite his discovery, shortly after commencing employment, that (1) CSAM "had only ninety-eight million dollars ($98,000,000.00) under management, sixty-four million dollars ($64,000,000.00) of which was Credit Suisse (Zurich) money," and (2) CSAM had no policies or procedures regarding money management, no trading or account administration, and no trading department.

In addition, plaintiff soon learned that various employees of defendants CSAM, CS, and SASI were arranging for United States residents and citizens to establish "tax avoidance" accounts in Switzerland, were soliciting resident aliens to create such accounts, and were allowing Swiss employees to maintain such accounts. Plaintiff also discovered that employees of defendant CS were engaging in an interstate direct mail and telephone campaign to solicit the banking business of high net worth American residents for the purpose of creating tax avoidance accounts. According to the complaint, that campaign constituted mail and wire fraud in violation of 18 US.C. § 1341. Plaintiff claims that, upon learning of some of these activities, he telephoned defendant Schwarzenbach and informed him that tax avoidance accounts were unlawful in the United States and explained that, as President of CSAM, he would not tolerate the solicitation, establishment or maintenance of such accounts by members of his staff or employees of CS.

In addition to the alleged conspiracy to "increase the number and size of tax avoidance accounts of American taxpayers," plaintiff claims to have uncovered a scheme to violate United States immigration law. In 1990 and 1991, CSAM hired three employees who were foreign nationals to work in its offices in the United States. According to plaintiff, those three employees did not possess "skills that were not readily obtainable in the United States" and thus did not meet the requirements for obtaining permanent resident status, or "green cards." Plaintiff claims that the three employees pressured him to obtain green cards for them and that defendant Schwarzenbach instructed him to "tell the immigration authorities whatever was necessary to obtain the green cards" for two of those employees. Nonetheless, plaintiff refused to comply with the demands and did not submit documentation to support the permanent resident applications of those three employees. The complaint states "[u]pon information and belief" that plaintiff's successor as President of CSAM later submitted the necessary documentation to support the resident alien application of one of those employees.

Plaintiff also claims to have discovered an illegal scheme on the part of defendant CS to charge defendant CSAM for the airline tickets of Swiss employees working in the United States. Plaintiff alleges that, in the Fall of 1992, he learned that CS had charged CSAM for the airline tickets of an employee named Thomas Heierli and his family, who had returned home to Switzerland for vacation. Plaintiff claims that he sent a memorandum to CS requesting information concerning charges for "international transfers" and, when he received no reply, he telephoned CS's Chief Financial Officer, who allegedly advised him not to "rock the boat."

Next, plaintiff claims to have discovered a violation of United States securities law on the part of a CSAM employee. He alleges that, soon after he began his employment with CSAM, he informed all CSAM employees that "principal transactions with defendant CS and its affiliates without client pre-approval are prohibited by United States securities law" and that CSAM "should only

engage in lawful transactions, *i.e.*, agency transactions with defendant CS and its affiliates, and agency and principal transactions with non-affiliates." Notwithstanding that directive, plaintiff claims that on April 13, 1993, a CSAM employee named Roland Leutwiler "individually and on behalf of CSAM, engaged in a principal transaction with defendant CS without client pre-approval," in violation of the United States securities laws. Plaintiff alleges that, immediately after he learned of this transaction, he telephoned defendant Sorg, who "minimized Leutwiler's transgression by calling it a 'mistake' and stating that plaintiff had done a good job." The complaint states that this use of the United States wires "furthered defendants' fraudulent scheme in that it enabled them to create an aura of concern about Leutwiler's misconduct, to purport to exonerate plaintiff, to keep plaintiff from contacting the Securities and Exchange Commission or otherwise changing the status quo, and ultimately, to use plaintiff as a scapegoat for the trading practices of defendant CS and its affiliates," and therefore that this use of the United States wires constituted wire fraud. Plaintiff subsequently "cooperated" in an examination of CSAM by the United States Securities and Exchange Commission ("SEC").

According to the complaint, defendants Sorg and Helwig informed plaintiff on September 29, 1993 that his employment with CSAM would terminate on October 1, 1993. Sorg and Helwig allegedly asked plaintiff to sign a proposed letter of resignation and a proposed letter agreement regarding the terms and conditions of his resignation; when plaintiff refused to sign the documents, CSAM discharged him. Although no one at CSAM informed plaintiff of any specific reason for his termination, the complaint states "[u]pon information and belief" that CSAM "summarily terminated plaintiff's employment because he is an American national and in order to replace plaintiff with a Swiss national" and in retaliation for plaintiff's refusal to act, or permit CSAM's and CS's employees to act, in a manner that violated United States law.

By memorandum dated September 30, 1993, defendant Meister, who replaced plaintiff as President of CSAM, informed all CSAM and CS staff that performance during the previous year had not met CSAM's goals, that "changes were necessary," and that plaintiff had "decided to pursue other interests." The complaint states that defendants CS and CSAM sent the memorandum to their branch offices via United States wires and that the memorandum "furthered defendants' fraudulent scheme in that it enabled defendants to use plaintiff as a scapegoat." It thus alleges that this use of the United States wires constituted wire fraud.

In addition, by letter to its clients dated October 4, 1993, CSAM allegedly announced defendant Meister's appointment as plaintiff's successor. It later sent CSAM's clients a letter regarding restitution for losses incurred in illegal "principal transactions." The complaint states that these uses of the United States mails constituted mail fraud in violation of 18 U.S.C. § 1341 because they "enabled defendants to use plaintiff as a scapegoat for defendants' unlawful business practices," to replace plaintiff with an individual who was amenable to allowing those unlawful business practices to occur, and to maintain their goodwill with their clients.

After plaintiff's termination, the SEC asked him to give voluntary testimony in connection with its investigation of defendant CSAM. By letter dated March 14, 1994, plaintiff asked defendant Sorg to arrange for CSAM to indemnify him for his legal fees in connection with the SEC examination. By letter dated May 16, 1994, defendant Meister advised plaintiff that CSAM would only consider plaintiffs request "in due course, at the conclusion of the investigation and any ensuing proceeding." After plaintiff made a second request to defendant Sorg for payment of legal expenses, defendant Meister sent plaintiff a second letter, dated August 17, 1994, reiterating CSAM's decision to consider plaintiffs request for indemnification "in due course, at the conclusion of the investigation and any ensuing proceedings." The complaint states that these uses of the United States mails constituted mail fraud in violation of 18 U.S.C. § 1341 because they "furthered defendant's fraudulent scheme" in that they "enabled defendants to attempt to

coerce plaintiff to testify favorably for defendant CSAM, defendant CSAM's Swiss employees and defendant CS's Swiss employees" and to assist CSAM and CS "in evading the consequences for its unlawful business practices." In January 1995 defendant CSAM reimbursed plaintiff for his legal fees in connection with the SEC investigation, which ended in November 1994 with a settlement in which CSAM agreed to pay a fine and to adopt certain procedures.

In sum, plaintiff complains that defendants (1) fraudulently induced him to leave his position with Bessemer to work for CSAM, (2) coerced him "to allow defendant CSAM's employees to act in a manner contrary to United States law," and (3) terminated his employment because he (a) refused "to condone the solicitation of tax avoidance accounts," (b) refused to permit CSAM and its employees to violate the United States securities, tax and immigration laws, and (c) is an American national. Specifically, the complaint alleges that defendants CSAM and CS constituted interstate enterprises and associations in fact among defendants CS, CSAM, SAC, SASI, Sorg, Schwarzenbach, Meister, and Helwig, whose fraudulent uses of the United States mails and wires were intended to, and did, cause plaintiff injury to his business, reputation and well-being and violated 42 U.S.C. § 2000e–2(a)(1) ("Title VII") and 18 U.S.C. §§ 1962(a), (b), (c), and (d). The complaint also contains state law claims against defendant CSAM for breach of contract and intentional infliction of severe mental distress, and against all defendants for prima facie tort.

In May 1994, plaintiff filed a Charge of Discrimination against defendant CSAM with the Equal Employment Opportunity Commission ("EEOC"), alleging that CSAM terminated his employment based on his national origin. The EEOC issued plaintiff a Notice of Right to Sue letter on March 14, 1995, which provided that plaintiff had the right to bring an action for discrimination against defendant CSAM within ninety days. Plaintiff thus commenced this action with the filing of his complaint on May 8, 1995.

With the exception of plaintiff's first cause of action against defendant CSAM under Title VII, defendants move to dismiss the complaint for failure to state a claim upon which relief can be granted. They argue that plaintiff's complaint: (A) fails to allege a valid Title VII claim against all of the defendants except CSAM because (1) Title VII does not provide for individual liability, and (2) plaintiff has failed to exhaust his remedies under Title VII with respect to all defendants except CSAM; (B) fails to allege a valid RICO claim because (1) RICO is unavailable for what is essentially a wrongful discharge claim, (2) plaintiff has failed to allege a "pattern of racketeering activity," (3) plaintiff lacks standing to sue under 18 U.S.C. §§ 1962(a), (b), (c), and (d), and (4) plaintiff's claims against several defendants fail properly to allege two or more predicate acts; and (C) fails properly to allege common law claims for prima facie tort, intentional infliction of emotional distress and breach of contract. Defendants' arguments will be addressed in turn.

## DISCUSSION

On a motion to dismiss for failure to state a claim, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), *cert. denied*, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994). *See also Dahlberg v. Becker*, 748 F.2d 85, 88 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985). The court may not dismiss a cause of action unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). Despite the liberality of this standard, the court need only accept as true the "well-pleaded factual allegations" in the complaint (*Papasan v. Allain*, 478 U.S. 265, 283, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986)), and need not credit "baldly conclusory" statements. *Duncan v. AT & T Communications, Inc.*, 668 F.Supp. 232, 234 (S.D.N.Y. 1987).

### A. *Title VII*

#### 1. *Individually Named Defendants*

Plaintiff's first claim for relief asserts that each of the defendants is liable under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), which prohibits discrimination by an "employer" on the basis of an individual's race, color, religion, sex or national origin. As the Act makes clear, "[t]he term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees ..., and any agent of such person...." 42 U.S.C. § 2000e(b). Defendants argue that plaintiff's Title VII claim must be dismissed as to the individual defendants—namely defendants Sorg, Schwarzenbach, Meister, and Helwig—because Title VII's definition of the term "employer" does not contemplate personal liability for individuals.

Defendants are correct. In *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313–16 (2d Cir.1995), the Second Circuit held explicitly that individual defendants may not be sued in their personal capacities under Title VII. The court found that the statutory scheme and remedial provisions of Title VII indicate that Congress intended to limit liability to employer-entities with fifteen or more employees, and it concluded that "[a] finding of agent liability ... would lead to results that Congress could not have contemplated." *Id.* at 1314. *See also Genas v. State of New York Dep't of Correctional Servs.*, 75 F.3d 825, 829 n. 3 (2d Cir.1996) (doctrine of "qualified immunity" held irrelevant to Title VII claims because there is no individual liability under Title VII); *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1241 n. 2 (2d Cir.1995) (even individuals with supervisory roles may not be held individually liable under Title VII); *Campbell v. Grayline Air Shuttle, Inc.*, 930 F.Supp. 794, 800 (E.D.N.Y. 1996) (same); *Amin v. Quad/Graphics, Inc.*, 929 F.Supp. 73, 78 (N.D.N.Y.1996) (same); *Jungels v. State University College of New York*, 922 F.Supp. 779, 782 (W.D.N.Y.1996) (because there is no individual liability of agents under Title VII, "the proper method for a plaintiff to recover under Title VII is by suing the employer"); *Tagare v. NYNEX Network Systems Co.*, 921 F.Supp. 1146, 1151

(S.D.N.Y.1996) (supervisors not individually liable under Title VII's definition of "employer"); *Storr v. Anderson School*, 919 F.Supp. 144, 148 (S.D.N.Y.1996) (*Tomka's* holding that supervisors are not individually liable under Title VII "strikes an appropriate balance between the interests that Congress sought to pursue"). In light of the Second Circuit's holding in *Tomka*, I respectfully recommend that plaintiff's Title VII claims against the individual defendants be dismissed.

#### 2. *Failure to Exhaust Remedies*

Defendants further argue that plaintiff's Title VII claim must be dismissed as to all defendants except CSAM because plaintiff named only CSAM in his EEOC charge. Again, defendants are correct.

As a jurisdictional condition precedent to commencing a Title VII action against a defendant, a plaintiff must file a complaint against that defendant with the EEOC within 300 days of the discriminatory act and obtain a right-to-sue letter. 42 U.S.C. § 2000e–5(e). *See, also Johnson v. Palma*, 931 F.2d 203, 209 (2d Cir.1991) (filing complaint naming the defendant is a prerequisite to commencing a Title VII action); *Campbell*, 930 F.Supp. at 798 (plaintiff must file complaint with EEOC within 300 days of discriminatory act). Subsection 706(f)(1) of Title VII provides that "a civil action may be brought against the respondent named in the [EEOC] charge...." 42 U.S.C. § 2000e–5(f)(1). Thus, as a general rule, a plaintiff may only bring a Title VII claim against parties that were named in the EEOC complaint. *Goyette v. DCA Advertising Inc.*, 830 F.Supp. 737, 747 (S.D.N.Y.1993). This rule ensures that defendants have adequate notice of potential claims and allows them to make early reparations without the expense of litigation. *Id.*

Courts generally take a "flexible stance in interpreting Title VII's procedural provisions." *Egelston v. State University College at Geneseo*, 535 F.2d 752, 755 (2d Cir.1976). Accordingly, the Second Circuit has created an exception to the general rule that a Title VII defendant must have been named in the EEOC complaint. *Johnson,*

931 F.2d at 209 (citing *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 905–06 (7th Cir.1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982)). This exception, known as the "identity of interest" exception, permits a plaintiff to bring a Title VII action against a defendant who was not named in the EEOC charge where there is a "clear identity of interest between the unnamed defendant and the party named in the administrative charge." *Johnson*, 931 F.2d at 209. Here, plaintiff argues that he should be permitted to proceed with his Title VII cause of action against the unnamed corporate defendants—namely CS, SAC, and SASI—because there is an identity of interest between those unnamed defendants and defendant CSAM.

■ Plaintiff's argument is inapposite. The "identity of interest" exception is intended to protect parties "not versed in the vagaries of Title VII and its jurisdictional and pleading requirements." *Id.* Thus, as a threshold matter, the exception "only applies where plaintiff [was] not represented by counsel" at the time of the EEOC filing. *Sharkey v. Lasmo (Aul Ltd.)*, 906 F.Supp. 949, 954 (S.D.N.Y.1995). *See also Alfano v. Costello*, 940 F.Supp. 459, 465 n. 2 (N.D.N.Y. 1996) (identity of interest exception "provides leniency to individuals filing EEOC complaints *pro se* "). It is undisputed that plaintiff was represented by counsel with regard to his EEOC complaint.[4] Accordingly, plaintiff does not meet this threshold requirement.

■ However, even if plaintiff had filed his EEOC charge *pro se*, the facts of this case do not weigh in favor of granting plaintiff the benefit of the "identity of interest" exception. To determine whether an identity of interest exists, thereby excusing a plaintiff's failure to name a defendant in the EEOC complaint, the court must consider the following four factors:

"1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the in-

terests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party."

*Johnson*, 931 F.2d at 209 (quoting *Glus v. G.C. Murphy Co.*, 562 F.2d 880, 888 (3d Cir.1977)). Applying these four factors to the allegations in plaintiff's complaint, it is clear that plaintiff has not demonstrated an identity of interest between defendant CSAM and the other corporate defendants.

As an initial matter, plaintiff concedes that he knew the identities and roles of the unnamed corporate parties at the time of the filing of the EEOC complaint and thus could have named them in the charge. Accordingly, plaintiff does not meet the first criterion.

■ The second and fourth factors are phrased so as to enable a plaintiff to bring Title VII claims against an agent's principal, even though he or she named only the agent in the EEOC charge, or to bring claims against an unnamed agent of a named principal. *See Tout v. Erie Community College*, 923 F.Supp. 13, 16 (W.D.N.Y.1995) (plaintiff met second and fourth factors of "identity of interest" test where unnamed defendants were agents of named corporate defendant); *Bridges v. Eastman Kodak Co.*, 822 F.Supp. 1020, 1025 (S.D.N.Y.1993) (permitting plaintiffs to include unnamed defendant in Title VII complaint where it was undisputed that an agency relationship existed between named and unnamed defendants); *Gilmore v. Local 295, Int'l Brotherhood of Teamsters*, 798 F.Supp. 1030, 1038 (S.D.N.Y.1992) (unnamed defendant field managers had substantial identity with corporate defendant who was named as respondent in EEOC charge because they were agents of the corporate defendant), *aff'd*, 23 F.3d 396 (2d

---

4. In fact, plaintiff was represented by Anne C. Vladeck, Esq. of Vladeck Waldman Elias & En-

gelhard, a Manhattan law firm specializing in employment discrimination cases.

Cir.), *cert. denied,* 513 U.S. 936, 115 S.Ct. 335, 130 L.Ed.2d 293 (1994). *See also John-son,* 931 F.2d at 210 (upholding dismissal of Title VII complaint against unnamed union defendant where named defendant was a local affiliate of unnamed union but was not an agent). Here, plaintiff has not alleged or submitted evidence to prove that CSAM, as the named defendant, had an agency relationship with any of the unnamed corporate defendants for the purposes of making employment decisions.[5] Plaintiff's bare allegations "upon information and belief" that "CSAM is a wholly-owned domestic subsidiary of defendant CS through defendant SAC" and that defendants CSAM, SAC and SASI are generally "dominated and controlled" by defendant CS are insufficient to establish an agency relationship. A determination that an agency relationship exists requires a finding that (1) the principal manifested an intent for the agent to act for the principal, (2) the agent manifested an acceptance of the undertaking, and (3) both parties understood that the principal would be in control of the undertaking. *Cabrera v. Jakabovitz,* 24 F.3d 372, 386 (2d Cir.) (citing Restatement (Second) of Agency § 1 cmt. b (1958)), *cert. denied,* 513 U.S. 876, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994). Here, plaintiff has presented no evidence from which the court could conclude that such an agency relationship existed with regard to CSAM's employment practices and policies. Indeed, conspicuously absent from plaintiff's complaint, as well as his EEOC charge, is a single factual reference to any discriminatory conduct by CS, SAC or SASI or any control by those entities over the decision to terminate plaintiff's employment. Nor does plaintiff allege that CS, SAC or SASI ever represented to him that he could deal with those entities through CSAM or treat CSAM as their agent.[6]

The third factor subsumes the underlying issue of notice. Courts have held that a plaintiff's failure to name or include a party in the agency complaint does not prejudice that party where it had notice of the claims against it and an opportunity to intervene. *See Martin v. Purolator Courier,* No. 94 CV 1004(FB), 1996 WL 429016, at *6 (E.D.N.Y. 1996). Although plaintiff asserts conclusorily in his memorandum of law that "the unnamed corporate defendants, who are represented by the same attorneys as defendant CSAM and who have a close, if not day to day relationship with defendant CSAM, had notice of plaintiff's Title VII claim," plaintiff has submitted no evidence to suggest that the unnamed corporate defendants had notice of plaintiff's EEOC charge against CSAM or, more importantly, of any claims *against them. See, e.g., Schnellbaecher v. Baskin Clothing Co.,* 887 F.2d 124, 126–27 (7th Cir.1989) (dismissing Title VII claim against employer's parent corporation where parent had notice of charges against employer but did not have notice of any charges against it or an opportunity to conciliate on its own behalf).

■ As explained above, the complaint alleges simply that (1) defendant CSAM was plaintiffs employer and a subsidiary of defendant CS "through defendant SAC," and (2) defendants CSAM, SAC and SASI are generally "dominated and controlled" by defendant CS. Although all of the corporate defendants are represented by the same legal counsel for purposes of the instant case, plaintiff does not allege that the corporate defendants otherwise share legal counsel or a legal department on a regular basis, such that the unnamed corporate defendants would have received notice of plaintiff's claims. *See, e.g., Philippeaux v. North Cen-*

---

**5.** Deciding whether to dismiss a defendant because of a plaintiff's failure to name that defendant as a respondent in his or her EEOC charge is a jurisdictional issue, governed by Fed.R.Civ.P. 12(b)(1). *Bridges v. Eastman Kodak Co.,,* 822 F.Supp. 1020, 1024 n. 4 (S.D.N.Y.1993). Therefore, the court may review extra-pleading material in deciding whether to dismiss Title VII claims against unnamed defendants. *Id.* As explained above, however, plaintiff has not submitted extra-pleading material to support his claim that the

unnamed corporate defendants meet the "identity of interest" test.

**6.** Plaintiff asserts conclusorily in his memorandum of law that "the unnamed defendants have projected to plaintiff that their relationship with him is through defendant CSAM." However, no such allegation appears in plaintiff's complaint and plaintiff has submitted no evidence to support that contention.

*tral Bronx Hosp.*, 871 F.Supp. 640, 650 (S.D.N.Y.1994) (because unnamed defendant municipality had an obligation to represent and indemnify named defendant hospital, it was on notice of plaintiff's EEOC proceeding), *aff'd*, 104 F.3d 353 (2d Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 1110, —— L.Ed.2d —— (1997); *Goyette*, 830 F.Supp. at 748 (because unnamed parent corporation and named subsidiary had "always been represented by the same legal counsel," parent corporation "by definition ... had adequate notice and representation in the EEOC proceedings"); *Kelber v. Forest Elec. Corp.*, 799 F.Supp. 326, 331 n. 4 (S.D.N.Y.1992) (because parent corporation and its subsidiary shared a legal department, the unnamed parent corporation had adequate notice of plaintiff's Title VII claim).[7]

7. Plaintiff argues that because the EEOC never conducted an investigation or engaged in conciliation efforts, the unnamed corporate defendants were not prejudiced as a result of plaintiff's failure to name them in the EEOC charge. Certainly, the lack of an EEOC investigation or conciliation efforts is a factor courts consider in determining whether an unnamed defendant has suffered prejudice. *See, e.g., Rivera v. Puerto Rican Home Attendants Servs., Inc.*, 922 F.Supp. 943, 948 (S.D.N.Y.1996); *Goyette v. DCA Advertising, Inc.*, 830 F.Supp. 737, 748 (S.D.N.Y. 1993). However, the fact that the EEOC did not actually conduct an investigation is not dispositive of this issue; the possibility that an unnamed party could have suffered prejudice due to plaintiff's failure to name it in the charge is sufficient when the other factors also weigh heavily against a finding of "identity of interest." *See, e.g., Johnson v. Palma*, 931 F.2d 203, 210 (2d Cir.1991) (although plaintiff's EEOC charge did not result in an EEOC investigation against the named defendant, "[a]n EEOC investigation, prompted by the filing of a charge against the [unnamed defendant], might have revealed that the [unnamed defendant] played no role in decisions relating to employees' grievances, resulting in a termination of the charges against it. For that reason, a finding against the [named defendant] actually would prejudice the [unnamed defendant] because it would be forced to participate in proceedings to resolve a dispute when it played absolutely no role in the cause of that dispute"); *Smith v. Local Union 28 Sheet Metal Workers*, 877 F.Supp. 165, 173 (S.D.N.Y.1995) (finding prejudice to unnamed defendants, even though the EEOC conducted no investigation, because "a broader EEOC investigation, prompted by the filing of charges against the unnamed parties, might have revealed that they were not involved in the alleged discrimination, resulting in a termination of charges against them"), *aff'd*, 100 F.3d 943 (2d

Because plaintiff was represented by counsel with regard to the filing of his EEOC charge and, at any rate, has not demonstrated an identity of interest between defendant CSAM and the unnamed corporate defendants, I respectfully recommend that plaintiff's Title VII claims be dismissed as to defendants CS, SAC and SASI.

## B. *RICO*

Plaintiff's fifth through tenth causes of action allege violations of RICO and conspiracy to violate RICO. Specifically, the complaint alleges that the actions of defendants CS, CSAM, SAC, SASI, Sorg, Schwarzenbach, Meister and Helwig constituted violations of 18 U.S.C. §§ 1962(a)[8], 1962(b)[9], 1962(c)[10] and 1962(d)[11], as well as a conspiracy to

Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 101, 136 L.Ed.2d 55 (1996); *Gilmore v. Local 295, Int'l Brotherhood of Teamsters*, 798 F.Supp. 1030, 1038 (S.D.N.Y.1992) (dismissing Title VII claims against unnamed union defendants, even though EEOC conducted no investigation, because requiring unions to defend against plaintiff's claims "would violate Title VII's scheme for providing notice to respondents"), *aff'd*, 23 F.3d 396 (2d Cir.), *cert. denied*, 513 U.S. 936, 115 S.Ct. 335, 130 L.Ed.2d 293 (1994).

8. 18 U.S.C. § 1962(a) states, in pertinent part: "It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce...."

9. 18 U.S.C. § 1962(b) states: "It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

10. 18 U.S.C. § 1962(c) states: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...."

11. 18 U.S.C. § 1962(d) states: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section".

violate 18 U.S.C. §§ 1962(a), 1962(b) and 1962(d).

### 1. *Proximate Injury*

As an initial matter, defendants contend that plaintiff lacks standing to sue under any of the RICO statutes because he has failed to allege that the racketeering activity of which he complains was a proximate cause of his injuries. According to defendants, plaintiff's RICO claims are nothing more than an attempt to collect treble damages for what is essentially a wrongful discharge claim, not recognized under New York law.

The relevant statute, 18 U.S.C. § 1964(c), provides:

Any person injured in his business or property *by reason of* a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee. (emphasis added) [12]

In *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Supreme Court explained that a RICO plaintiff "only has standing [under section 1964(c) ] if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Id.* at 496, 105 S.Ct. at 3285. *Accord Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 279, 112 S.Ct. 1311, 1323–24, 117 L.Ed.2d 532 (1992). Thus, "the RICO pattern or [predicate] acts must proximately cause plaintiff's injury." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir.1990). For the RICO pattern or acts to proximately cause a plaintiff's injury, they must be a "substantial factor in the sequence of responsible causation, and . . . the injury [must be] reasonably foreseeable or anticipated as a natural consequence." *Id.* at 23–24. *See also Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634, 636 (2d Cir.1989) ("The phrase 'by reason of' re-

quires that there be a causal connection between the prohibited conduct and plaintiff's injury"); *Burdick v. American Express Co.*, 865 F.2d 527, 529 (2d Cir.1989) (per curiam) ("in order to establish standing, [plaintiff] must show that the damage to his business or property resulted from the alleged mail and securities fraud").

In evaluating the issue of proximate cause, the Second Circuit has held that a plaintiff's injuries are not proximately caused by a defendant's alleged RICO violation, or predicate acts of mail or wire fraud, where the plaintiff was neither the direct target of the racketeering enterprise nor a competitor or customer of the racketeer. *Sperber v. Boesky*, 849 F.2d 60, 65 (2d Cir.1988). *See also In re American Express Co. Shareholder Litigation*, 39 F.3d 395, 400 (2d Cir.1994) (dismissing RICO claims by shareholders who were not the intended targets of the RICO violations); *Hecht*, 897 F.2d at 24 (dismissing RICO claims where plaintiff was neither the target of the racketeering enterprise nor a competitor or customer of the racketeer); *Miller v. Helmsley*, 745 F.Supp. 932, 938 (S.D.N.Y.1990) (" 'the Second Circuit [has] concluded that plaintiffs who are either targets of the racketeering enterprise, competitors, or customers of the racketeer are those plaintiffs who were probably intended by Congress to recover under RICO' ") (quoting *Department of Economic Dev. v. Arthur Andersen & Co.*, 747 F.Supp. 922, 941 (S.D.N.Y.1990)).

Applying this standard, courts in this circuit and others consistently have declined to accord standing under section 1962(c) to employees who were discharged or otherwise penalized either for "whistle blowing" activities or for refusing to participate in the alleged racketeering activity. In each case, the court has concluded that any injury flowing from the employer's conduct was not sufficiently proximate to the alleged RICO violations for standing purposes. *See, e.g.,*

---

**12.** As part of the 1995 Private Securities Litigation Reform Act, Congress amended 18 U.S.C. § 1964(c) to remove securities fraud claims as a RICO predicate act. 18 U.S.C. § 1964(c) now provides that "no person may rely upon any conduct that would have been actionable as

fraud in the purchase or sale of securities to establish a violation of section 1962." This amendment became effective after the date plaintiff commenced this action and, at any rate, is not relevant to the instant case.

*Hecht,* 897 F.2d at 24; *Burdick,* 865 F.2d at 529–30; *Norman,* 873 F.2d at 636–37; *J.S. Service Center Corp. v. General Elec. Technical Servs. Co.,* 937 F.Supp. 216, 221 (S.D.N.Y. 1996); *Haviland v. J. Aron & Co.,* 796 F.Supp. 95, 100–02 (S.D.N.Y.), *aff'd,* 986 F.2d 499 (2d Cir.1992), *cert. denied,* 507 U.S. 1051, 113 S.Ct. 1945, 123 L.Ed.2d 650 (1993); *Giuffre v. Metropolitan Life Ins. Co.,* 129 F.R.D. 71, 75–78 (S.D.N.Y.1989). *See also Reddy v. Litton Indus., Inc.,* 912 F.2d 291, 294 (9th Cir.1990) ("All of the circuit courts that have considered this issue have held that an employee who is wrongfully discharged for refusing to participate in an alleged pattern of racketeering activity lacks standing to sue under § 1962(c)"), *cert. denied,* 502 U.S. 921, 112 S.Ct. 332, 116 L.Ed.2d 272 (1991); *Cardwell v. Sears Roebuck and Co.,* 821 F.Supp. 406, 409 (D.S.C.1993) (" 'The majority of federal courts view the retaliatory discharge claims brought by employees terminated because of their refusal to participate in wrongful predicate offense conduct . . . as not stating a RICO claim because the plaintiff is not injured by his employer's predicate criminal acts' ") (quoting David B. Smith and Terrance G. Reed, Civil RICO § 6.04[5][c][i] (1993)).[13]

 In the instant case, the crux of plaintiff's complaint is that the defendants formed an "association in fact" enterprise through which they engaged in various predicate acts of mail and wire fraud constituting a "pattern of racketeering activity." The complaint divides the "pattern of racketeering activity"

into a number of separate sub-schemes, the most prominent of which is an alleged plan to "increase the number and size of tax avoidance accounts of American taxpayers." In addition, the complaint describes illegal schemes to violate the United States securities and immigration laws. Plaintiff asserts that defendants used him "to provide defendant CSAM with instant credibility," and then later as a scapegoat for their various illegal acts.

Plaintiff's allegations are insufficient for purposes of RICO standing. As an initial matter, I question whether defendants' alleged fraudulent activity actually injured plaintiff in his "business or property." Despite plaintiff's conclusory contention that he has "suffered serious damage to his reputation in the commercial community and the attendant loss of career opportunities" as a result of the alleged RICO violations, plaintiff admits that he discovered much of the fraud soon after his employment began. Thus, plaintiff could have left CSAM at any time during the alleged fraudulent activity with his reputation and job prospects intact. Instead, he chose to remain CSAM's President and Chief Investment Officer until he was fired over two years later. *See Haviland,* 796 F.Supp. at 100 (questioning whether alleged illegal investment scheme injured plaintiff employee in his business or property where he could have left his employment at any time during the scheme). Indeed, nowhere in his complaint does plaintiff allege that he has actually attempted to find a

---

**13.** *See also Bowman v. Western Auto Supply Co.,* 985 F.2d 383, 385–86 (8th Cir.), *cert. denied,* 508 U.S. 957, 113 S.Ct. 2459, 124 L.Ed.2d 674 (1993) (simple act of discharging employee is not a RICO predicate act); *Miranda v. Ponce Fed. Bank,* 948 F.2d 41, 47 (1st Cir.1991) ("a claim for wrongful discharge cannot be successfully pursued under RICO when the injury itself is not the result of a predicate act"); *Kramer v. Bachan Aerospace Corp.,* 912 F.2d 151, 156 (6th Cir.1990) (dismissing RICO claims where "plaintiff's injury resulted from defendants' decision to fire him in retaliation because he reported an allegedly fraudulent scheme to his superiors and to government officials"); *O'Malley v. O'Neill,* 887 F.2d 1557, 1563 (11th Cir.1989), *cert. denied,* 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990) (injury did not arise from RICO violation but "from the tangentially related decision to fire [plaintiffs]"); *Cullom v. Hibernia Nat'l Bank,* 859

F.2d 1211, 1214 (5th Cir.1988) (a person who refuses to participate in an activity that violates RICO and is constructively discharged as a result "does not have standing to sue under RICO for his discharge").

A number of authors have also commented on the courts' consistent denial of standing for employees claiming a loss of employment or income due to their refusal to participate in alleged RICO violations. *See, e.g.,* Keith S. Marks, Note, *RICO Law—Wrongful Discharge and RICO Conspiracy Standing: The* Holmes v. Securities Investor Protection Corp. *Direct–Injury Test Resolves the Standing Issue,* 16 W. New Eng. L.Rev. 365 (1994); Gregory P. Joseph, Civil RICO, A Definitivie Guide 31–32; Laura Ginger, *Causation and Civil RICO Standing: When Is a Plaintiff Injured "By Reason Of" a RICO Violation?,* 64 St. John's L.Rev. 849 (1990).

comparable position elsewhere, much less that he has been unable to do so.

Nonetheless, even assuming an injury to plaintiff's business or property, such injury was not a direct result of the alleged RICO violations. The predicate acts of mail and wire fraud did not cause plaintiff's injury *directly*, since any proximate injury resulting from defendants' RICO violations would have been to the United States government or to CSAM's or CS's clients. *Id.* Rather, plaintiff's injury resulted from CSAM's decision to terminate his employment after he refused to participate in or countenance defendants' illegal schemes. As one court commented in a similar case, "[f]iring [plaintiff] under these circumstances was wrong, but it did not violate the RICO Act." *Nodine v. Textron, Inc.,* 819 F.2d 347, 349 (1st Cir.1987). Thus, although defendants' RICO violations may have factually caused plaintiff's loss of employment and resulting injury, such injury was not a "foreseeable natural consequence" thereof. *Hecht,* 897 F.2d at 24.

Plaintiff attempts to distinguish the above case law by arguing that the RICO schemes in those cases were directed at persons or entities other than the plaintiff, whereas defendants' alleged RICO acts were directed at plaintiff personally. However, plaintiff's insistence that he was the intended target of defendants' fraudulent acts is belied by his repeated allegations, throughout the complaint, that defendants devised their fraudulent scheme primarily "to increase the number and size of tax avoidance accounts of American taxpayers." (Complaint ¶ 18. *See also* Complaint ¶¶ 19–21, 48, 57–70, 130 and 198). In fact, plaintiff specifically alleges that defendants terminated his employment, "because plaintiff refused to condone the solicitation of tax avoidance accounts by defendant[s]" (Complaint ¶ 20) and "in retaliation for plaintiff's refusal to act, and permit defendant CSAM's employees to act, in a manner that violates United States immigration law" (Complaint ¶ 131) or "in a manner that violates United States securities laws." Complaint ¶ 132.

Courts repeatedly have rejected similar attempts by plaintiffs to circumvent the RICO pleading requirements by alleging that they were the intended targets of RICO violations. *See, e.g., Burdick,* 865 F.2d at 529–30 (rejecting plaintiff's claim that he was fired as an "integral part" of the illegal scheme rather than in retaliation for reporting it); *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1168 (3d Cir.1989) (neither plaintiff's being hired away from her previous job nor her firing "when she refused to play the good soldier … can fairly be said to have resulted from the violations of [RICO] or from the predicate acts necessary to establish these"); *Vito Vitone v. Metropolitan Life Ins. Co.,* 954 F.Supp. 37, 38–39 (D.R.I.1997) (rejecting RICO claims of plaintiff employee who contended that inducement to join the defendant company and subsequent "scapegoating" were part of defendant's overall scheme to defraud policyholders).

*Haviland* is instructive on this point. In that case, the plaintiff was a futures broker who claimed that his employer fired him for refusing to provide confidential information about his clients. *Haviland,* 796 F.Supp. at 96. Although the plaintiff described the defendants' illegal activity as a scheme to defraud him personally, and complained that the predicate acts of mail and wire fraud deprived him of income and employment opportunities, the court looked beyond the conclusory assertions in the complaint and examined the underlying factual bases of the plaintiff's RICO claims. *Id.* at 100. Ultimately, the court determined that the defendants' customers were the actual targets and intended victims of the scheme to obtain confidential client information. *Id.* The court held that despite the plaintiff's "creative pleading" he could not disguise the fact that his injuries "resulted from his refusal to accede to the scheme rather than the racketeering activity itself." *Id.* at 102. Explaining that "the proximate injury requirement for [RICO] standing is a rigorous one, and … efforts to plead around it solely for the purposes of avoiding its impact will not be tolerated," the court found that the plaintiff lacked standing under RICO. *Id.*

Likewise, in this case the intended victims of the alleged "racketeering enterprise" were CSAM's and CS's clients and the United States government. Any injury to plaintiff

was a remote and incidental by-product of those racketeering activities and resulted from his refusal to accede to the alleged fraudulent schemes, rather than the racketeering activity itself. Because plaintiff was not injured "by reason of" defendants' alleged predicate acts of mail and wire fraud, he has no standing to bring any civil RICO claims.

### 2. *Pattern of Racketeering Activity*

Defendants also argue that plaintiff has failed to allege a pattern of racketeering activity, a required element under 18 U.S.C. §§ 1964(a), (b) and (c). *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 232, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989). *See also Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 154, 107 S.Ct. 2759, 2766, 97 L.Ed.2d 121 (1987) ("the heart of any RICO complaint is the allegation of a pattern of racketeering").

18 U.S.C. § 1961(5) provides that a pattern of racketeering activity "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." However, as the Supreme Court explained in *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14, "two isolated acts of racketeering activity do not constitute a pattern." Rather, the distinguishing characteristic of a pattern is "*continuity plus relationship.*" *Id.* (emphasis in original).

A "concrete definition for precisely what activity will constitute a 'pattern' for purposes of the RICO statute has eluded the federal courts." *United States Textiles, Inc. v. Anheuser-Busch Cos.*, 911 F.2d 1261, 1266 (7th Cir.1990). *See also H.J. Inc.*, 492 U.S. at 243, 109 S.Ct. at 2902-03 ("the precise methods by which [a RICO pattern] may be proved, cannot be fixed in advance with such clarity that it will always be apparent whether in a particular case a 'pattern of racketeering activity' exists"). Nonetheless, the courts have advanced some general guidelines for determining whether a pattern of racketeering activity exists. Namely, the plaintiff must demonstrate that the predicate acts of mail or wire fraud are related in that they " 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *H.J. Inc.*, 492 U.S. at 230, 109 S.Ct. at 2896 (quoting former 18 U.S.C. § 3575(e)). In addition to showing relatedness, the plaintiff must demonstrate continuity, *i.e.,* "a series of related predicates extended over a substantial period of time" (*id.* at 242, 109 S.Ct. at 2902) or "past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. at 2902.

A pattern is not formed by "sporadic activity" (*id.* at 239, 109 S.Ct. at 2900-01) and must have more than a "single, short-term goal." *Cullen v. Paine Webber Group, Inc.*, 689 F.Supp. 269, 273 (S.D.N.Y. 1988). *See also United States v. Kaplan*, 886 F.2d 536, 542-43 (2d Cir.1989) (to show continuity, a plaintiff must demonstrate that the defendant's acts were not "isolated" or "sporadic"), *cert. denied*, 493 U.S. 1076, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990). Thus, a series of predicate acts that, together, constitute a single scheme to accomplish "one discrete goal" and are "directed at one individual with no potential to extend to other persons or entities" does not satisfy the continuity requirement where there is no genuine threat of continuing illegal activity. *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir.1990). *See also J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 819 (7th Cir.1991) (dismissing RICO claims that "merely involv[ed] 'a highly contentious aftermath of a single transaction' "); *Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank*, 934 F.2d 976, 981 (8th Cir.1991) ("a single transaction which involves only one victim and takes place over a short period of time does not constitute the pattern of racketeering required...."); *Mathon v. Marine Midland Bank, N.A.*, 875 F.Supp. 986, 998 (E.D.N.Y.1995) (dismissing RICO complaint that alleged "a single transaction involving one alleged victim ... one real estate transaction, a limited goal, no threatened future action, and no allegation of long-term criminal conduct"); *Singer v. American Psycho-*

*logical Ass'n,* 92 Civ. 6082, 1993 WL 307782, at *11 (S.D.N.Y. August 9, 1993) (dismissing RICO claims alleging a scheme to discredit plaintiffs' psychological theories where predicate acts were "too isolated, sporadic and limited in their goal to implicate Congress' concern with long-term criminal conduct"); *Airlines Reporting Corp. v. Aero Voyagers, Inc.,* 721 F.Supp. 579, 584 (S.D.N.Y.1989) (dismissing RICO complaint alleging a closed-ended, single scheme involving one victim, three perpetrators, and one uncomplicated transaction—essentially relating to a simple breach of contract—occurring over thirteen months).

A critical factor in determining whether the predicates are "continuing" under RICO is the "terminable quality" of the goal or purpose of the enterprise. *Mead v. Schaub,* 757 F.Supp. 319, 323 (S.D.N.Y.1991). Thus, courts have repeatedly rejected claims by terminated employees as failing to allege a "pattern of racketeering activity." For example, in *Cullen,* 689 F.Supp. 269, the court dismissed a RICO complaint that alleged fraud in the recruitment of stockbrokers. The plaintiffs in that case alleged that the defendants had embarked on a scheme to recruit them in an effort to capture their client bases. The court found that the alleged enterprise had a "clear terminating goal"—to recruit plaintiffs and acquire their business—and that the goal was effectively accomplished when the defendant terminated the plaintiffs' employment. *Id.,* at 274.

Likewise, in *Mead,* the plaintiff alleged that the defendants had fraudulently induced him to leave his former employment in California to accept a management consultant position with the defendant company in New York. The RICO claims in that case rested on the allegation that the defendants knowingly made numerous misrepresentations about the company and the proposed position in an effort to recruit plaintiff and capture his client bases. The court held that, although the alleged scheme to defraud Mead may have required a number of steps that took place over a period of years, the alleged enterprise had a "clear terminating goal" which was accomplished once Mead left the company. *Mead,* 757 F.Supp. at 323. It thus upheld the lower court's dismissal of the complaint.

Here, defendants argue that Tarr has not adequately alleged a pattern of racketeering activity because he has failed to satisfy both the "relatedness" and "continuity" requirements. They contend that the allegations cannot meet the above requirements because they concern at least three different and unrelated illegal schemes with different purposes and different victims.

The complaint alleges essentially eleven predicate acts of mail and wire fraud, as follows:

| | Paragraph | Date | Alleged Act |
|---|---|---|---|
| 1. | 46 | 7/9/91 | Letter to plaintiff from CSAM, through Schwarzenbach and Helwig, *re* salary and compensation |
| 2. | 47 | 7/9/91 | Letter to plaintiff from CS, through William E. Gilbert, *re* salary and compensation |
| 3. | 68 | — | Letters to CS customers soliciting tax avoidance accounts |
| 4. | 69 | — | Telephone calls to CS customers soliciting tax avoidance accounts |
| 5. | 110 | 5/93 | Call between plaintiff and Sorg in which plaintiff informed Sorg *re* Roland Leutwiler's principal transaction and Sorg "minimized" the transgression |
| 6. | 136 | 9/30/93 | Memorandum sent by wire to branch offices *re* plaintiff's departure |
| 7. | 139 | 10/4/93 | Letter to customers from CSAM *re* hiring of plaintiff's replacement |
| 8. | 142 | — | Letter to CSAM's customers *re* restitution for losses from prohibited securities transactions |

| Paragraph | Date | Alleged Act |
|---|---|---|
| 9. 150 | 5/16/94 | Letter to plaintiff *re* plaintiff's request for payment of attorney's fees |
| 10. 155 | 8/17/94 | Letter to plaintiff *re* plaintiff's request for payment of attorney's fees |
| 11. 181 | 10/18/92 | Letter from CS to plaintiff *re* salary and compensation |

As explained above, however, Tarr lacks standing to sue upon a scheme directed at third parties. He must establish that the alleged acts constituted a pattern of racketeering activity that was intended to defraud him personally. *See, e.g., Shearin,* 885 F.2d at 1164 (dismissing RICO claims by plaintiff alleging that she was induced to join defendant company to give it "the facade of a genuine trust company" and then fired to prevent her from divulging securities fraud; "the relation of the alleged fraudulent hiring to the actual securities fraud scheme [was] too attenuated to be considered part of the same pattern of racketeering activity"); *Casper v. Paine Webber Group, Inc.,* 787 F.Supp. 1480, 1498 (D.N.J.1992) (dismissing RICO claim that defendants engaged in a scheme to avoid paying income taxes, allegedly furthered through acts of mail and wire fraud in connection with the hiring, employment, and retaliatory firing of plaintiff; "the allegedly wrongful termination of [plaintiff] is not predicate act under RICO and the resulting injury to [plaintiff] cannot form the basis of RICO standing").

▌ Thus, although the complaint appears to describe a series of related acts intended to defraud defendants' clients and the United States government and extending over a substantial period of time, the court must focus exclusively on the alleged fraudulent acts that defendants directed at plaintiff personally. Pursuant to the complaint, the scheme to defraud plaintiff was two-pronged. The goals of the alleged fraudulent scheme were to (1) recruit plaintiff in order to lend credibility to a "skeletal, start-up" business, and (2) use plaintiff over two years later as a "scapegoat" when he refused to condone the commission of certain unlawful conduct.

These allegations fail to meet either element of the "relatedness plus continuity" test. First, the two goals—to hire plaintiff in order to provide "instant credibility" to CSAM and to terminate him later in an effort to set him up as a "scapegoat" for defendants' illegal acts—are narrowly directed and have wholly separate, indeed antithetical, purposes. As a result, they cannot satisfy the "relatedness" requirement. Second, each of those two goals was terminable in nature. The first was accomplished when plaintiff accepted the position as President and Chief Investment Officer of CSAM, and the second was accomplished upon the termination of plaintiff's employment. Despite plaintiff's bare and conclusory assertion that the scheme against him "continues," there is no allegation in the complaint of any specific predicate acts, of any kind, that are currently taking place or are likely to take place in the future. Indeed, it defies logic to suggest that a threat of continued fraudulent activity *against plaintiff* exists when his employment with CSAM terminated over two years ago.

▌ In short, rather than alleging a series of related predicates extending over a substantial period of time, or a series of predicate acts that project a threat of repetition, the complaint contains allegations concerning isolated and sporadic acts directed against plaintiff, and ending in his termination. Thus, plaintiff's RICO claims under 18 U.S.C. §§ 1964(a), (b) and (c) do not satisfy the relatedness and continuity requirements, and I respectfully recommend that they be dismissed for failure to allege a pattern of racketeering activity.[14]

14. In addition, as defendants point out, a plaintiff seeking to state a valid RICO claim "must charge each named defendant with the commission of two or more predicate acts." *Morin v. Trupin,* 747 F.Supp. 1051, 1064 (S.D.N.Y.1990). The complaint fails to charge defendants SAC and SASI with the commission of any predicate acts, and charges defendants Helwig and Schwarzenbach with the commission of only one predicate act each. Accordingly, plaintiff's RICO claims against those defendants may be dismissed on this additional ground.

Defendants also argue that plaintiff's allegations of mail and wire fraud fail to conform to

### 3. RICO Conspiracy

■ Plaintiff also alleges that the defendants conspired to commit the complained of racketeering acts, in violation of 18 U.S.C. § 1962(d). The essence of a RICO conspiracy is an agreement to commit predicate acts in violation of 18 U.S.C. § 1962(a), (b) or (c). See Hecht, 897 F.2d at 25; Mathon, 875 F.Supp. at 1000–01. Thus, a civil RICO conspiracy complaint must, at the very least, allege specifically an agreement by each defendant to commit at least two predicate acts. Hecht, 897 F.2d at 25. See also Com–Tech Assocs. v. Computer Assocs. Int'l, Inc., 753 F.Supp. 1078, 1092 (E.D.N.Y.1990) ("[t]o state a claim for RICO conspiracy, plaintiff must allege that each defendant, by words or actions, manifested an agreement to commit two predicate acts in furtherance of the common purpose of the RICO enterprise'") (quoting First City Nat'l Bank and Trust Co. v. FDIC, 730 F.Supp. 501, 509 (E.D.N.Y. 1990)), aff'd, 938 F.2d 1574 (2d Cir.1991).

■ A thorough review of plaintiff's complaint reveals that it fails to allege any specific facts demonstrating the existence of an agreement between the defendants, let alone an agreement for each alleged participant to commit two predicate acts. Plaintiff's conspiracy allegation is limited to the single, broad statement that "[d]efendants conspired to commit the aforesaid racketeering activity and participated in numerous overt acts in furtherance of the conspiracy." (Complaint

¶ 22(e)) This bare and conclusory allegation does not state a civil RICO conspiracy claim. See Mathon, 875 F.Supp. at 1001 (dismissing RICO conspiracy claim where plaintiff alleged generally "conspiratorial acts," "conspiratorial manner," "conspiratorial method," and "conspiratorial pattern"); Giuliano v. Everything Yogurt, Inc., 819 F.Supp. 240, 249 (E.D.N.Y.1993) (complaint failed to state RICO conspiracy claim because "the complaint—wordy as it is—does not supply any facts to buttress its 'barebones' allegation that [two of the defendants] or any other person agreed to commit any predicate acts of mail fraud or wire fraud"); Laverpool v. New York City Transit Authority, 760 F.Supp. 1046, 1060 (E.D.N.Y.1991) (RICO conspiracy claim dismissed where complaint set forth no specific allegation of an agreement); Connolly v. Havens, 763 F.Supp. 6, 14 (S.D.N.Y.1991) (dismissing conclusory RICO conspiracy claims that failed to contain any specific factual allegations to support a finding that each of the defendants "consciously agreed to commit at least two predicate acts").[15] Accordingly, I respectfully recommend that plaintiff's claim under 18 U.S.C. § 1962(d) be dismissed.

### C. State Law Claims

#### 1. Breach of Contract

■ In his third claim for relief, plaintiff asserts that "the actions of defendant CSAM constitute a breach of contract." (Complaint

---

the particularity requirements of Fed.R.Civ.P. 9(b). Pursuant to this higher pleading standard, a mail or wire fraud claim " 'must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.' " McLaughlin v. Anderson, 962 F.2d 187, 191 (2d Cir.1992) (quoting Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir.1989)). See also Colony at Holbrook, Inc. v. Strata G.C., Inc., 928 F.Supp. 1224, 1232 (E.D.N.Y.1996) (dismissing RICO claims that failed to set forth the " 'content, date, [or] place of any alleged misrepresentations, and the identity of the persons making them ' ") (quoting Center Cadillac, Inc. v. Bank Leumi Trust Co., 808 F.Supp. 213, 229 (S.D.N.Y. 1992)). Having recommended that plaintiff's RICO claims be dismissed for lack of standing and failure to allege a pattern of racketeering activity, I find it unnecessary to reach this issue.

15. In my view, this is precisely the type of case to which the Second Circuit referred when it stated that it had no "disposition ... to countenance fanciful invocations of the draconian RICO weapon in civil litigation." Town of West Hartford v. Operation Rescue, 915 F.2d 92, 104 (2d Cir.1990). See also United States v. Huber, 603 F.2d 387, 395–96 (2d Cir.1979) ("the potentially broad reach of RICO poses a danger of abuse [through] attempts to apply the statute to situations for which it was not primarily attempted"), cert. denied, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). In addition, I agree with Judge Spatt's caveat in Mathon v. Marine Midland Bank, N.A., 875 F.Supp. 986, 1001 (E.D.N.Y.1995), that "alleged RICO violations must be reviewed with appreciation of the extreme sanctions it provides, so that actions traditionally brought in state courts do not gain access to treble damages and attorneys fees in federal court simply because they are cast in terms of RICO violations."

¶ 226). It is both well-established and undisputed that New York is an "employment-at-will" state. Thus, absent an express agreement limiting an employer's discretion—such as a written contract, collective bargaining agreement or specific term in an employee handbook—every New York employer has an "unfettered right" to terminate its employees at any time and for any (nondiscriminatory) reason, or for no reason. *Wieder v. Skala,* 80 N.Y.2d 628, 593 N.Y.S.2d 752, 754, 609 N.E.2d 105, 107 (1992). *See also Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 514 N.Y.S.2d 209, 211, 506 N.E.2d 919, 920 (1987) ("It is still settled law in New York that, absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party"); *Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 235–36, 448 N.E.2d 86, 89 (1983) (declining to recognize the tort of abusive or wrongful discharge because "such a significant change in our law is best left to the Legislature"); *Weiner v. McGraw–Hill, Inc.,* 57 N.Y.2d 458, 457 N.Y.S.2d 193, 197, 443 N.E.2d 441, 445 (1982) (declining to dismiss breach of contract claim for termination where employment application and employee handbook represented that employees could be discharged only "for just and sufficient cause" and complaint alleged that defendants induced plaintiff to leave prior employment and subsequently reject other offers in reliance on that assurance); *Tyson v. Hess,* 109 A.D.2d 1068, 487 N.Y.S.2d 206, 208 (4th Dep't) ("An employer, public or private, has the unqualified right to terminate an at-will employee without any kind of hearing, absent a constitutionally impermissible purpose, a statutory proscription, or an express limitation in the individual contract of employment"), *aff'd,* 66 N.Y.2d 943, 498 N.Y.S.2d 778, 489 N.E.2d 747 (1985).

■ Plaintiff's breach of contract claim rests on his contention that three letters, taken together, created a contract that obligated CSAM to employ plaintiff through December 31, 1993. The first, a letter from "defendant CSAM, through defendants Schwarzenbach and Helwig," dated July 9, 1991, stated, in relevant part:

We are pleased to provide this memorandum of understanding whereby you will be joining Credit Suisse Asset Management as President and Chief Investment Officer on or about August 12, 1991. Your salary will be $16,666.66 per month which will be increased to $17,500.00 per month effective January 1, 1992. You will also receive $75,000.00 shortly after beginning employment with us and an additional $59,000.00 in April 1992 which together represent a total bonus of $125,000.00 for the calendar year 1992. For the year 1992 you will receive a bonus of $125,000.00 which will be paid in April 1993. We also agree to work together to formulate an incentive compensation scheme for your position beginning for the calendar year 1993 which is mutually agreeable to yourself and us.

The second, a letter from "defendant CS, through William E. Gilbert," also dated July 9, 1991, stated: "You will note that the annual salary review period was advanced from April to January to be consistent with the practice at CSAM although bonus payments remain scheduled for April." The third, a letter from "defendant CS, through defendant Sorg and Victor Erne, members of defendant CS' Executive Board," dated December 18, 1992, stated: "In the absence of a Management Incentive Plan, which we hope to establish within the first quarter of 1993, we have agreed to pay you a separate amount of US$360,000 in addition to your 1992 salary.... Your basic salary for 1993 will be US$250,000."

In essence, plaintiff claims that these references to his compensation for 1993 created an employment contract extending through December 31, 1993, which CSAM breached by terminating his employment on October 1, 1993. Plaintiff is incorrect. New York courts consistently have held that an employer does not create an employment contract for a specific duration merely by referencing terms such as "annual salary." *See Tyson,* 487 N.Y.S.2d at 208 ("[t]he fact that compensation is measured by a specific period of time does not render the employment a hiring for a specific term"); *Chase v. United Hosp.,* 60 A.D.2d 558, 400 N.Y.S.2d 343, 344 (1st Dep't 1977) (denying breach of contract claim based on letter that established an

annual rate of salary but stated no specific term of employment). *See also Heinrichs v. Marshall and Stevens Inc.*, 921 F.2d 418, 420 (2d Cir.1990). Conspicuously absent from any of the letters described above is a specific term identifying a specific period of employment. Accordingly, I respectfully recommend that plaintiff's breach of contract claim against defendant CSAM be dismissed for failure to state a cause of action.[16]

### 2. *Intentional Infliction of Emotional Distress*

 Plaintiff's fourth claim for relief alleges that "[t]he actions of defendant CSAM constitute an intentional infliction of severe emotional distress." (Complaint ¶ 228) In New York, a plaintiff suing for the intentional infliction of emotional distress must assert his or her claim within one year of the acts giving rise to the tort. N.Y. Civ. Prac. L. & R. 215(3) (McKinney 1994); *Campbell v. Grayline Air Shuttle, Inc.*, 930 F.Supp. 794, 803 (E.D.N.Y.1996); *Misek–Falkoff v. International Bus. Mach. Corp.*, 162 A.D.2d 211, 556 N.Y.S.2d 331, 331 (1st Dep't), *appeal denied*, 76 N.Y.2d 708, 560 N.Y.S.2d 990, 561 N.E.2d 890 (1990). In the instant case, plaintiff's claim for intentional infliction of emotional distress is based on CSAM's decision to terminate his employment. That termination took place on October 1, 1993, over nineteen months before plaintiff commenced this action on May 8, 1995. Accordingly, plaintiff's claim for intentional infliction of emotional distress is time-barred.[17]

Moreover, under New York law, a plaintiff claiming intentional infliction of emotional distress must prove four elements:

(1) conduct that goes beyond "all possible bounds of decency;" (2) intention to cause distress, or knowledge that defendant's conduct would result in emotional distress; (3) severe emotional distress; and (4) a causal link between the defendant's conduct and plaintiff's distress.

*Gay v. Carlson*, 60 F.3d 83, 89 (2d Cir.1995) (citing *Richard L. v. Armon*, 144 A.D.2d 1, 536 N.Y.S.2d 1014, 1015 (2d Dep't 1989)). The standard for stating a claim of intentional infliction of emotional distress is very high, requiring an allegation of conduct " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir.1985) (quoting *Fischer v. Maloney*, 43 N.Y.2d 553, 402 N.Y.S.2d 991, 993, 373 N.E.2d 1215, 1217 (1978)). Thus, New York

---

**16.** I also note that plaintiff's argument concerning the three letters contradicts the allegation in his complaint that defendant Schwarzenbach and Mr. Freedman represented to him that defendants CSAM and CS "were making a long term (at least five year) commitment to plaintiff." (Complaint ¶ 51).

In addition, two of the letters are alleged to have emanated from defendant CS, via its employees and agents. As explained above, plaintiff has failed to set out with any specificity the relationships among the corporate defendants and thus does not even attempt to explain how a letter from CS could create an employment contract between plaintiff and CSAM.

**17.** Plaintiff's argument that defendants' wrong "is a continuing one" because defendants "are still seeking to make plaintiff the scapegoat for the findings and fine associated with the [SEC's] investigation and to destroy plaintiff's career by disparaging him and holding him up to scorn and ridicule in the financial community" is unavailing. First, the complaint is wholly devoid of any allegations concerning specific acts that are currently taking place. More importantly, however, it is well-settled that "[a] cause of action for intentional infliction of emotional distress is limited to conduct that occurred within the one-year period immediately preceding the commencement of the action." *Foley v. Mobil Chem. Co.*, 214 A.D.2d 1003, 626 N.Y.S.2d 906, 907 (4th Dep't), *reh'g denied*, No. 412/95, 1995 WL 413878 (1995). *See also Santan–Morris v. New York Univ. Med. Ctr.*, 96 Civ. 0621(MGC), 1996 WL 709577, at *4 (S.D.N.Y. Dec.10, 1996) ("New York courts have been reluctant to expand the general theory of continuing wrongs to claims based on intentional infliction of emotional distress"); *Spitzer v. Shanley Corp.*, 151 F.R.D. 264, 267 (S.D.N.Y.1993) ("time-barred causes of action cannot be revived under New York law even if the acts are alleged as part of a continuing wrong"). Plaintiff concedes that the only specific allegation in his complaint concerning an event that occurred in the year immediately preceding the commencement of this action is his claim involving CSAM's delay of several months in reimbursing plaintiff for his legal expenses. That delay does not constitute "extreme and outrageous" conduct sufficient to state a claim for intentional infliction of emotional distress. *See Murphy*, 461 N.Y.S.2d at 236–37, 448 N.E.2d at 90; discussion *infra*.

courts routinely dismiss causes of action for intentional infliction of emotional distress brought by employees attempting to circumvent the traditional "employment-at-will" rule by framing what would otherwise be wrongful discharge claims as claims sounding in tort. *See, e.g., Cartelli v. Lanier Worldwide, Inc.,* 872 F.Supp. 1253, 1256 n. 2 (S.D.N.Y.1995) (allowing an employment dispute to proceed as a claim for intentional infliction of emotional distress would "mak[e] demotion (and even more so dismissal) an extremely high risk step for any employer to take" and "would effectively destroy New York's rule that employment at will is permissible"); *Ingle v. Glamore Motor Sales, Inc.,* 73 N.Y.2d 183, 538 N.Y.S.2d 771, 772–75, 535 N.E.2d 1311, 1312–14 (1989) (New York courts "decline[ ] to allow the use of substitute nomenclature or causes, such as . . . intentional infliction of emotional distress, to bootstrap the threshold deficiency in a wrongful discharge claim"); *Murphy,* 461 N.Y.S.2d 232, 448 N.E.2d at 90 (a plaintiff employee cannot use a claim for intentional infliction of emotional distress to "subvert the traditional at will contract rule"). *See also Gerzog v. London Fog Corp.,* 907 F.Supp. 590, 604 (E.D.N.Y.1995) ("In the rare instances where the New York courts have found the complaint sufficient to state a claim for intentional infliction of emotional distress in the employment context, the claims have been accompanied by allegations of sex discrimination, and more significantly, battery"). Since plaintiff's claim for intentional infliction of emotional distress rests entirely on his allegation of wrongful termination, his claim would fail to state a cause of action even if plaintiff had filed it within the applicable statute of limitations.

### 3. *Prima Facie Tort*

 Finally, plaintiff's second claim for relief alleges that the "actions of defendants, CSAM, CS, Sorg, Schwarzenbach, Meister [and] Helwig constitute a prima facie tort." The elements of prima facie tort are: " (1) intentional infliction of harm, (2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts that would otherwise be lawful." *MaGee v. The Paul Revere Life Ins. Co.,* 954

F.Supp. 582, 587 (E.D.N.Y.1997) (citing *Freihofer v. Hearst Corp.,* 65 N.Y.2d 135, 490 N.Y.S.2d 735, 741, 480 N.E.2d 349, 354–55 (1985)).

 To state a claim for prima facie tort under New York law, a plaintiff must allege "that the actions complained of were motivated solely by malice or 'disinterested malevolence.'" *Warnaco Inc., v. VF Corp.,* 844 F.Supp. 940, 954 (S.D.N.Y.1994) (quoting *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 464 N.Y.S.2d 712, 721, 451 N.E.2d 459, 468 (1983)). *See also Twin Labs., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 571 (2d Cir.1990) (a plaintiff suing for prima facie tort must allege facts to demonstrate that the defendant's conduct "was not only harmful, but was done with the sole intent to harm"); *MaGee,* 954 F.Supp. at 588 ("Where the plaintiff merely pleads intentional and malicious action, but not that the defendant's 'sole motivation' was 'disinterested malevolence,' the complaint will be dismissed") (quoting *Burns,* 464 N.Y.S.2d at 721, 451 N.E.2d at 468). For this reason, "[w]hen there are other motives, such as profit, self-interest, or business advantage, there is no recovery under the doctrine of *prima facie* tort." *Marcella v. ARP Films, Inc.,* 778 F.2d 112, 119 (2d Cir.1985). *See also Kalika v. Stern,* 911 F.Supp. 594, 605 (E.D.N.Y.1995) (" 'if a defendant's motive is tainted by self interest, profit or business advantage, a *prima facie* tort action cannot be sustained' ") (citation omitted); *Frutico S.A. de C.V. v. Bankers Trust Co.,* 833 F.Supp. 288, 301 (S.D.N.Y.1993) (a claim for prima facie tort will fail where the "defendant's action were [sic] motivated to some extent by economic self-interest").

Plaintiff's complaint describes a number of motives for defendants' alleged acts. As plaintiff points out, paragraph 208 of the complaint charges that defendants "inflicted harm on plaintiff with the sole intent to harm plaintiff." However, elsewhere in the complaint plaintiff accuses defendants of having terminated his employment because he "refused to permit violation of United States tax law," "securities law," and "immigration law," "because plaintiff is an American national" (Complaint ¶¶ 20, 129–32) and in order "to

use plaintiff as a scapegoat." (Complaint ¶ 144). Indeed, the complaint is replete with allegations that defendants hired plaintiff in order to further their alleged RICO schemes and later fired him in order to shift the blame for their illegal actions. Thus, pursuant to the express allegations of the complaint, defendants were not motivated solely by intent to harm Tarr, but were motivated at least in part by profit, self-interest and business advantage. Since many of plaintiff's allegations are inconsistent with the primary element of a claim for prima facie tort, that claim fails as a matter of law.

Contrary to plaintiff's argument, the court cannot accept his bare and conclusory allegation that defendants acted "with the sole intent to harm plaintiff" as merely "alternative pleading." It is true that a plaintiff may plead a claim for prima facie tort alternatively with other claims. *Board of Ed. v. Farmingdale Classroom Teachers Ass'n*, 38 N.Y.2d 397, 380 N.Y.S.2d 635, 645, 343 N.E.2d 278, 285 (1975). By the same token, prima facie tort is not a " 'catch-all' alternative for every cause of action which cannot stand on its own legs." *Freihofer*, 490 N.Y.S.2d 735, 741, 480 N.E.2d 349, 355 (1985) (citations omitted). Thus, where a traditional tort remedy exists, the court will not foreclose—as alternative relief—a cause of action for prima facie tort based on the same facts. However, a plaintiff may not invoke prima facie tort as a basis to sustain a pleading that otherwise fails to state a cause of action in traditional tort. *Id.* (dismissing claim for prima facie tort where plaintiff failed to state a conventional tort claim). *See also Cruz v. Triangle Affiliates, Inc.*, 571 F.Supp. 1218, 1222 (E.D.N.Y.1983) (" It would make little sense to hold that plaintiff may not prevail on a cause of action, having

failed to establish certain elements, which are essential thereto, and then in the exercise of flexibility, apply a different name to it, and without correcting any of the fatal defects, permit the cause of action (absent a unique quality) to stand") (citation omitted); *Church of Scientology v. Siegelman*, 94 F.R.D. 735, 738 (S.D.N.Y.1982) ("A party will not be allowed to take a defective claim for malicious prosecution, abuse of process, or any other traditional tort and simply recast it as one for *prima facie* tort"); *Curiano v. Suozzi*, 63 N.Y.2d 113, 480 N.Y.S.2d 466, 470, 469 N.E.2d 1324, 1328 (1984) (plaintiffs may not "avoid the stringent requirements we have set for traditional torts" by pleading prima facie tort in the alternative); *Belsky v. Lowenthal*, 62 A.D.2d 319, 405 N.Y.S.2d 62, 65 (1st Dep't 1978) ("It would be unwise, we think, to allow every unrealized cause of action to be tortured into a prima facie tort action, by the liberal application of 'malicious' to the motives of the disappointed plaintiff, thus affording a forum for a never ending source of new litigation"), *affd*, 47 N.Y.2d 820, 418 N.Y.S.2d 573, 392 N.E.2d 560 (1979). Specifically, a claim for prima facie tort " 'cannot be allowed in circumvention of the unavailability of a tort claim for wrongful discharge or the contract rule against liability for discharge of an at-will employee.' " *Loudon v. Hayek*, 756 F.Supp. 107, 109–10 (S.D.N.Y.1989) (quoting *Murphy*, 461 N.Y.S.2d at 237, 448 N.E.2d at 91).

As discussed above, plaintiff's complaint fails to state a cause of action in traditional tort.[18] I therefore respectfully recommend that his claim for prima facie tort be dismissed.

*Conclusion*

For the reasons stated above, I respectfully recommend that defendants' motions to

---

18. In addition, the complaint alleges generally that "[a]s a proximate result of the wrongful acts committed by defendants ... plaintiff has incurred substantial monetary damages." (Complaint ¶ 220). Such an allegation does not meet the requirement that a plaintiff plead "special damages." *See Broadway & 67th St. Corp. v. City of New York*, 100 A.D.2d 478, 475 N.Y.S.2d 1, 6 (1st Dep't 1984) (to state a claim for prima facie tort, a plaintiff must "fully and accurately" state his or her damages "with sufficient particularity as to identify and causally relate the actual losses to the allegedly tortious acts"). The claim in plaintiff's memorandum of law that his "loss of income until the end of 1993, three months['] salary at $20,833.33 per month, constitutes special damages" is insufficient to remedy the defect in his complaint. *See Fonte v. Board of Managers of Continental Towers Condominium*, 848 F.2d 24, 25 (2d Cir.1988) ("Factual allegations contained in legal briefs or memoranda are ... treated as matters outside the pleading for purposes of Rule 12(b)").

dismiss be granted in their entirety. Objections to this report and recommendation must be filed with the Clerk of the Court, with a courtesy copy to Judge Block, within ten (10) days to preserve appellate review. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Dated: Brooklyn, New York

March 21, 1997.