OPINION
This is an appeal by plaintiff, Krieger Ford, Inc., from a judgment of the Franklin County Court of Common Pleas, following a jury trial in which a verdict was rendered against defendant, Chase Motors, Inc. ("Chase Motors"), in plaintiff's action to recover losses resulting from dishonored checks.
Defendant Peter Renaut ("Renaut") is the owner of Chase Motors, a used car dealership located on East Main Street, Whitehall. Renaut incorporated Chase Motors in 1984, and he directs and controls the day-to-day operations of the company. Renaut also incorporated, in 1993, defendant Sommer Automotive, Inc. ("Sommer Automotive"), dba Summit Auto Sales.[1]
Defendant Jacqueline Masters is the office manager for Chase Motors. Masters' responsibilities included check writing authority for the business activities of Chase Motors and Sommer Automotive.
Plaintiff is an auto dealership that maintains both a new and used-car department. Part of plaintiff's business includes the sale of used cars to wholesalers. George Krieger, plaintiff's president, provided testimony regarding the procedures for transferring title as a result of such sales. Under normal circumstances, it takes between three to ten days to obtain a title from a customer who is trading in a vehicle. If the vehicle is later sold to a wholesaler, the car is often physically transferred to the wholesaler before payment is made and title is transferred. Krieger testified that, when a title to a vehicle is ready, plaintiff notifies the wholesaler, at which time the wholesaler usually brings in a check and receives title.
For approximately two to three years prior to the events giving rise to the instant lawsuit, Chase Motors purchased a number of wholesale used cars from plaintiff. As described above, typically the vehicles would be physically delivered to Chase Motors' used car lot prior to payment, and plaintiff would hold title to the vehicles until payment was made.
Chase Motors had a checking account with Bank One, and both Renaut and Masters had check-signing authority on the account. Chase Motors had an on-going relationship with Modern Finance Company ("Modern Finance"), whereby Chase Motors received floor plan financing for its inventory. Under the floor plan arrangement, title to a vehicle would be given to Modern Finance as security for the loan to Chase Motors. In order to obtain floor plan financing, Modern Finance also required Chase Motors to provide an invoice, representing an agreed price and agreement to buy a car from either an auction or local dealer.
The series of transactions giving rise to the instant action began on September 23, 1996, when Chase Motors issued a check for $90,700 payable to Krieger Ford. Chase Motors issued the check as part payment for the purchase of ninety-nine vehicles from plaintiff's dealership, arising out of an agreement between Renaut, on behalf of Chase Motors, and Dave Ruark, an employee of plaintiff's used-car department. On September 27, 1996, Chase Motors issued another check to Krieger Ford in the amount of $210,500. In both instances, Chase Motors obtained titles to the vehicles at the time Chase Motors' check was tendered to plaintiff. Chase Motors subsequently applied to the Ohio Bureau of Motor Vehicles ("BMV") to have titles issued to Chase Motors.
On September 30, 1996, Modern Finance issued a check to Chase Motors in the amount of $109,800 as part of a floor plan financing arrangement for thirty-two vehicles purportedly purchased from Krieger Ford. Renaut acknowledged that he wrote up the purchase order, which was then presented to Modern Finance. On that same day, Chase Motors issued a check to Modern Finance in the amount of $106,075 to pay off cars under a different floor plan arrangement. On October 1, 1996, at Renaut's direction, Masters called Bank One and requested a stop payment on the two checks written to Krieger Ford. Renaut did not direct Masters to notify plaintiff regarding the action taken to stop payment.
The check issued to Modern Finance was eventually returned for non- sufficient funds. Stan Goodburn, the treasurer of Modern Finance, testified that he spoke with Renaut on either October 4 or 5 about the returned check, and that Renaut indicated that Chase Motors was experiencing difficulties because of bad checks the company had received from the sale of cars. Specifically, Renaut indicated that $125,000 worth of checks had "bounced" because a wholesaler from the south "had dooped one of his agents." (Tr. 230.) Renaut also indicated to Goodburn that Krieger Ford "must have beat you to the bank." (Tr. 230.) Renaut did not inform Goodburn that he had ordered a stop payment on the checks to plaintiff on October 1, 1996. Renaut also sent a statement to Goodburn indicating that Chase Motors had received two bad checks in the amounts of $50,000 and $75,000 respectively. The statement, issued by Bank One to Chase Motors, did not provide information as to the source of the bad checks. Evidence at trial indicated that Renaut had written two checks from the Sommer Automotive checking account on September 30, 1996, in the sums of $50,000 and $75,000, payable to Chase Motors. At the time those checks totaling $125,000 were written, the Sommer Automotive checking account had less than $1,200 in funds.
Plaintiff soon became aware that the checks issued by Chase Motors as payment for the sale of the ninety-nine vehicles had not been honored, and plaintiff's president, Krieger, spoke with Renaut about trying to resolve the issue. At that time, Krieger told Renaut to return as many vehicles with titles for full credit. Seventeen vehicles were returned over a two- day period, and plaintiff credited Chase Motors' account by approximately $60,000. Krieger also spoke with Renaut about replacing the original check for $90,700. On the date plaintiff picked up the seventeen vehicles, Renaut gave plaintiff's used car manager another check for $90,700, dated October 9, 1996. According to plaintiff's president, Renaut requested that the replacement check be held until the next Wednesday, at which time Renaut was going to take some vehicles to an auction in an attempt to generate cash to make the check good. Renaut denied telling any of plaintiff's employees to hold the check. The evidence indicates that Renaut placed a stop payment on the check immediately after it was written.
The following Wednesday, Krieger spoke with Renaut. According to the testimony of Krieger, Renaut indicated that he did not know if the vehicles had been sold or whether he had sufficient funds to cover the check. The next day, Renaut told Krieger that "he did not have the money, but he was working out a deal to get some money from some borrower." (Tr. 95.) Renaut indicated that he was experiencing problems because "some checks that had been given to him were insufficient funds and had been taken out of his checking account." (Tr. 97.) Renaut faxed Krieger a document, identified at trial as plaintiff's Exhibit No. 17A, indicating that two checks, in the amounts of $50,000 and 75,000, respectively, had been returned for insufficient funds. Krieger testified that Renaut did not inform him that the bad checks had come from the Sommer Automotive account; rather, Renaut stated the checks "had come from other wholesalers. He didn't tell me who. I didn't know specifically about other wholesalers." (Tr. 97.)
On October 10, 1996, Krieger contacted an attorney regarding Chase Motors' failure to honor the checks. Plaintiff filed with the trial court a motion for a temporary restraining order against defendants, seeking to restrain defendants from transferring, selling or removing certain vehicles identified in a list submitted with the motion. The list identified eighty -two vehicles.
On October 18, 1996, the trial court granted plaintiff's motion and issued a temporary restraining order. On that same date, Renaut signed a check from the Chase Motors account, payable to the order of "cash," in the amount of $13,050. Three other similar checks were signed by Renaut that day, payable to "cash" in the amounts of $5,000, $7,100 and $2,500.
Plaintiff's Exhibit No. 8, representing BMV records, indicates that thirty-nine of the vehicles at issue were sold for a total of $189,755. As previously noted, Chase Motors also received floor plan financing from Modern Finance in the amount of $113,000 for those vehicles. Plaintiff has never received any payment for the vehicles transferred to Chase Motors.
On October 15, 1996, plaintiff filed a complaint, naming as defendants Chase Motors, Peter Renaut and Jacqueline Masters. Plaintiff filed an amended complaint on November 8, 1996, adding Sommer Automotive as a defendant. Plaintiff's complaint included claims for fraud, unjust enrichment, wrongful conversion and a violation of Ohio's Racketeer Influenced and Corrupt Organization ("RICO") statute.
The case came for trial before a jury beginning on May 12, 1997. At the close of plaintiff's case, the trial court granted a directed verdict in favor of defendants Masters, Renaut and Sommer Automotive. The case proceeded against defendant Chase Motors, and the jury returned a verdict in favor of plaintiff on the claim of fraud and determined plaintiff was entitled to $236,300 in compensatory damages. The jury further determined that plaintiff was entitled to punitive damages. The parties agreed to submit for the trial court's determination the issue of the amount of punitive damages.
Following the jury verdict, plaintiff filed a motion, pursuant to Civ.R. 50(B), for judgment against Renaut for fraud and punitive damages or, in the alternative, for a new trial. The trial court subsequently denied plaintiff's Civ.R. 50(B) motion and motion for new trial. By entry filed August 26, 1997, the trial court entered judgment in favor of plaintiff and against Chase Motors for fraud and restitution in the amount of $236,300. The trial court further determined that plaintiff was entitled to punitive damages in the amount of $100. The trial court also determined that sanctions were not warranted for defendant's violation of a temporary restraining order.
On appeal, plaintiff sets forth the following seven assignments of error for review:
 1. The Trial Court erred in overruling the Civil Rule 50 Motion for Judgment against Defendant-Appellee Peter Renault [sic] for fraud and punitive damages.
 2. The Trial Court erred in awarding only $100.00 in punitive damages.
 3. The Trial Court erred in directing the verdict in favor of Defendant-Appellee Peter Renault [sic].
 4. The Trial Court erred in directing the verdict in favor of Defendant-Appellee Jacky L. Masters.
 5. The Trial Court erred in directing the verdict in favor of all the Defendants-Appellees on the Civil RICO claim.
 6. The Trial Court erred in excluding evidence probative of Defendant-Appellee Renault's [sic] alter ego control of the Defendant-Appellee corporations and relevant to the Civil RICO and fraud claims.
 7. The Trial Court erred in failing to order sanctions to punish the Defendant-Appellees Contempt of Court for violations of the Temporary Restraining Order and Preliminary Injunctions.
Plaintiff's first and third assignments of error are interrelated and will be discussed together. Under the first assignment of error, plaintiff contends that the trial court erred in overruling plaintiff's motion for judgment notwithstanding the verdict against defendant Renaut based on plaintiff's contention that Renaut is personally liable for fraud perpetrated on behalf of the corporation Chase Motors. Under the third assignment of error, plaintiff argues that the trial court erred in granting a directed verdict as to defendant Renaut, based again on the argument that Renaut is personally liable for his tortious conduct. Plaintiff also contends that Renaut is personally liable for the acts of Chase Motors under the theory of "piercing the corporate veil."
As noted under the facts, at the close of plaintiff's case, the trial court granted defendants' motion for directed verdict as to various defendants, including Renaut. Further, following the jury verdict of fraud against Chase Motors, plaintiff filed a Civ.R. 50(B) motion against Renaut which the court overruled, finding that there was no evidence of fraud on the part of Renaut.
The same standard of review is applied for a motion for directed verdict and a motion for judgment notwithstanding the verdict. The question presented is whether, in construing the evidence adduced at trial and the facts established in the record most strongly in favor of the plaintiff, reasonable minds could reach different conclusions as to plaintiff's entitlement to relief. Posin v. A.B.C. Motor Court Hotel, Inc.
(1976), 45 Ohio St.2d 271, 275. Further, "[n]either the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon" such motion. Id.
Upon review, we conclude that the evidence presented in support of plaintiff's fraud claim against Renaut was sufficient to withstand a motion for directed verdict. The evidence presented at trial indicates that Renaut, the president of Chase Motors, was actively involved in the day-to-day management of the business. Renaut dealt personally with plaintiff's employee, Dave Ruark, regarding the agreement to purchase the subject ninety-nine vehicles. Based on the normal practices of the parties, Chase Motors did not receive title to vehicles obtained from plaintiff until payment was rendered. On September 23, 1996, a check was issued from the Chase Motors account in the amount of $90,700. A second check, in the amount of $210,500 was issued four days later. The evidence construed most strongly in favor of plaintiff indicates that Renaut, in an effort to induce plaintiff to turn over titles to vehicles, issued checks from the Chase Motors account to plaintiff at a time when Renaut knew or should have known that there were insufficient funds to cover the checks. In return, Chase Motors obtained titles to vehicles it did not own, which were then pledged as security for floor plan financing through Modern Finance.
Chase Motors received $113,000 in financing from Modern Finance as a result of obtaining titles to pledge. The day after Chase Motors received the floor plan financing, Renaut ordered a stop payment on the first two checks issued to plaintiff. There was evidence by which a trier of fact could reasonably conclude that the corporation's delivery of titles to Modern Finance constituted a representation by Chase Motors that it actually owned the vehicles pledged by the titles. Stan Goodburn, the treasurer for Modern Finance, testified that he believed that the purchase orders provided to him by Renaut were genuine, and that he would not have issued the floor plan check to Chase Motors if he had known the vehicles had not been purchased by the corporation. Chase Motors sold at least thirty-nine of plaintiff's vehicles for a total of $189,755, and BMV records offered at trial by plaintiff indicate that most of the vehicles were sold after Renaut had ordered the stop payment on the first two checks to plaintiff. Plaintiff has never received any payment for the vehicles delivered to Chase Motors.
Renaut acknowledged that, on the date the first check for $90,700 was issued to plaintiff, he did not believe that the account had funds to cover that amount. At trial, plaintiff submitted a bank statement from Bank One covering the period of August 31 through September 30. The balance in that account on September 23, 1996, was $46,430. The subsequent check from Chase Motors to plaintiff, issued on September 27, 1996 in the amount of $210,500, was also dishonored. Renaut also acknowledged that on October 1, 1996, one day after receiving the check for floor plan financing from Modern Finance, he directed his employee Masters to make a stop payment on these checks to plaintiff. Renaut, however, did not inform plaintiff of this action.
There was evidence presented upon which a trier of fact could find that Renaut furthered the scheme by making misleading statements to representatives of both plaintiff and Modern Finance. Renaut acknowledged that he had a conversation with Stan Goodburn, in which Renaut indicated that he was having trouble paying bills because two checks he received from another party had bounced. Goodburn testified that Renaut represented that the bad checks were from a wholesaler located somewhere in the south. When Renaut was asked on cross-examination whether he had told Goodburn that the bad checks were from another wholesaler, Renaut testified, "I was trying to move money around in accounts to cover all the checks is what I was trying to do." (Tr. 300-301.) He acknowledged that on September 28, 1996, he wrote a check in the amount of $50,000 and another in the amount of $75,000 from the Sommer Automotive checking account to Chase Motors. He further admitted that there were insufficient funds in that account to cover those checks. Plaintiff's Exhibit No. 22, a Bank One bank statement for the account of Sommer Automotive, indicates that the balance in the account as of September 30, 1996, was $1,156.09. Renaut admitted that he gave an employee of Krieger Ford a copy of the bank notice indicating that checks for $50,000 and $75,000 were returned for insufficient funds as an explanation for why the checks written to Krieger Ford were no good. The bank notice does not reveal that the two dishonored checks were actually from the Sommer Automotive account.
Regarding the check he wrote to Krieger Ford, dated October 9, 1996, in the amount of $90,700, Renaut stated that he issued the check because Dave Ruark came to Chase Motors and requested payment for the previous bad check. Renaut testified that, at the time he wrote the check, he knew there were insufficient funds to cover the check and that, "I knew I was going to stop payment the minute he [Ruark] left." (Tr. 311.) Although the check at issue was dated October 9, 1996, the evidence indicated that the stop payment was made on October 7, 1996. Renaut denied that he told anyone at Krieger Ford to hold the check until October 9.
Fraud has been defined as "any kind of artifice employed by one person to deceive another, or of some willful act or omission which is unconscientious and a violation of good faith, and by which one person obtains an undue advantage over another." Ross v. Barker (1995), 101 Ohio App.3d 611,618. Further, "[b]y fraud is meant all surprise, trick, cunning, dissembling, and other unfair ways that are used to cheat another. It is a deception deliberately practiced with a view to gaining an unlawful or unfair advantage." Id. It has been held that "[i]ntent to defraud exists where a defendant issues a worthless check to a creditor or vendor to fraudulently induce the creditor or vendor to part with property in reliance upon the check's value." State v. Hines (July 3, 1995), Butler App. No. CA94-09-182, unreported. "In addition, where a defendant has no reasonable ground to believe the funds in his bank account would be sufficient to cover checks issued, an inference of intent to defraud exists." Id.
It is well-settled under Ohio law that "corporate officers may be held personally liable in tort." Bowes v. Cincinnati Riverfront Coliseum,Inc. (1983), 12 Ohio App.3d 12, 18. See, also,Centennial Ins. Co. v. Tanny Int'l. (1975), 46 Ohio App.2d 137,141 ("Directors and corporate officers generally may be personally liable for fraud even though the corporation may be liable also"); CincinnatiBible Seminary v. Griffiths (Oct. 10, 1984), Hamilton App. No. C-830867, unreported ("Corporate directors and officers may * * * be personally liable for corporate debts on the ground of fraud"); Stateex rel. Fisher v. AM. Courts, Inc. (1994), 96 Ohio App.3d 297,300 ("corporate officers may be held personally liable for actions of the company if the officers take part in the commission of the act or if they specifically directed the particular act to be done, or participated or cooperated therein").
One commentator has noted:
 A person is personally liable for all torts which that person committed, notwithstanding the person may have acted as the agent or under directions of another. This rule applies to torts committed by those acting in their official capacities as officers or agents of a corporation. It is immaterial that the corporation may also be liable. The person injured may hold either liable, and generally the injured person may hold both as joint tort-feasors.
 Corporate officers are liable for their torts, although committed when acting officially. * * * Personal liability attaches, regardless of whether the breach was accomplished through malfeasance, misfeasance or nonfeasance. 3A Fletcher Cyc Corp (Perm Ed 1994) 289-290, § 1135.
While not dispositive, we note that defendants did not challenge the jury's finding of fraud against Chase Motors by way of a motion to set aside the jury's verdict or through appeal. In the present case, the evidence construed most strongly in favor of plaintiff reveals substantial evidence to support plaintiff's claim that Renaut, as an individual participant, knowingly engaged in acts constituting fraud. As one court has noted, "what is often spoken of as a corporate act is in reality the act of an individual" and, "in the field of torts, especially intentional torts or those requiring some personal guilty knowledge, the individual, and not the corporate entity, may be held responsible." Lippman PackingCorp. v. Rose (1953), 120 N.Y.S.2d 461, 464. Further, we note that "[p]ersonal liability for the torts of officers does not depend on the same grounds as `piercing the corporate veil.'" Fletcher, supra, at 290. Rather, "[t]he true basis of liability is the officer's violation of some duty owed to the third person which injures such third person."Id. Accordingly, we conclude that the trial court erred in granting Renaut's motion for directed verdict where reasonable minds could reach different conclusions as to Renaut's personal liability for fraud. Based on the above, we need not reach the issue raised by plaintiff for alternative liability against defendant Renaut based on the theory of piercing the corporate veil.
Plaintiff also argues the trial court erred in failing to grant his Civ.R. 50(B) motion, and that this court should simply enter judgment for fraud against Renaut without the need for a new trial. We decline plaintiff's invitation. Renaut was directed out of this case at the close of plaintiff's case, and thus he did not present a defense on his own behalf. The issue of Renaut's individual liability for fraud was properly a matter for the jury's determination and we therefore remand for a new trial.
Based upon the foregoing, plaintiff's third assignment of error is sustained to the extent provided above while plaintiff's first assignment of error is overruled.
Under the second assignment of error, plaintiff argues that the trial court's $100 award of punitive damages constituted an abuse of discretion.
We initially note that the jury, in addition to rendering judgment against Chase Motors based on a finding of fraud, also made a specific finding that plaintiff was entitled to punitive damages. Further, the parties in the instant case agreed in open court to allow the trial judge to assess the amount of damages. The record suggests that the parties were unaware of the Ohio Supreme Court's 1994 decision holding that a plaintiff has the right, in a case tried to a jury, to have the jury determine punitive damages as well as to assess the amount of such damages. Zoppov. Homestead Ins. Co. (1994), 71 Ohio St.3d 552. The trial court, in its decision addressing the issue of punitive damages, recognized that, pursuant to the holding in Zoppo, the determination of the actual punitive damages amount should have been submitted to the jury. The trial court further found, however, because neither party made an objection, that it would proceed to determine the amount of punitive damages.
In Little Beaver Creek Valley Railroad Historical Society, Inc. v.P.L. W. Railroad, Inc. (June 10, 1998), Columbiana App. No. 95-CO-76, unreported, the court noted:
 An appellate court may not disturb a damage award if it is supported by competent, credible evidence. See Baum v. Augenstein (1983), 10 Ohio App.3d 106, 460 N.E.2d 701. "If the acts complained of are wanton or otherwise aggravated, the court may award punitive damages." Meacham v. Miller (1992), 79 Ohio App.3d 35, 40, 606 N.E.2d 996. Punitive damages are awarded to punish an offending party and to deter others from engaging in similar conduct. Preston v. Murty (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174. R.C. 2315.21 allows punitive damages to be awarded in tort actions where actual damages have been proven, and where the actions of the defendant demonstrate malice, fraud, oppression, or insult. To establish a claim for punitive damages in an action for fraud, the plaintiff must prove the elements of the tort itself, and demonstrate that the fraud was aggravated by the existence of malice or ill will, or must demonstrate that the wrong doing was particularly gross or egregious. Charles R. Combs Trucking, Inc. v. International Harvester Co. (1984), 12 Ohio St.3d 241, 466 N.E.2d 883, paragraph three of the syllabus. The determination of the amount of punitive damages is within the sound discretion of the trier of fact, and will not be disturbed on appeal unless it is shown that the award of punitive damages was a result of passion or prejudice. Okocha v. Fehrenbacher (1995), 101 Ohio App.3d 309, 324, 655 N.E.2d 744.
Plaintiff argues that the trial court's assessment of the evidence on the issue of punitive damages conflicted with the jury's determination, and that the court erroneously concluded that no aggravated fraud was proven. We are constrained to agree. In the present case, the jury was instructed that it could not find defendant liable for punitive damages unless it made a finding that the fraud perpetrated by defendant was "aggravated or egregious." The jury was further instructed that "[f]raud is aggravated if it is accompanied by the existence of malice or ill will," and that "[f]raud is egregious if the fraudulent wrongdoer is particularly gross." The jury subsequently returned a verdict finding that punitive damages were warranted, presumably based on a determination that the fraud was either aggravated or egregious. However, despite the jury's finding on this issue, the trial court made its own finding of "little or no
evidence of any malice in this case." (Emphasis added.) Further, the trial court's decision indicates that the sole reason it awarded even "nominal" punitive damages was because "there is no motion for j.n.o.v. on this issue."
The factors to be considered in determining an appropriate award of punitive damages "include, but are not limited to, the nature of the conduct that resulted in the injury, the financial condition of the defendant, the amount necessary to deter future similar conduct, and prior or similar acts by the defendant, as well as the amount of actual or compensatory damages." Wightman v. Consol. Rail Corp. (1994),94 Ohio App.3d 389, 408. In the present case, the finding by the trial court ("little or no malice") on the issue of punitive damages was in essence directed to the issue of liability of the defendant (a matter already determined by the jury), rather than a consideration as to the appropriate amount. While we recognize that the trial court was not in agreement with the jury's determination as to entitlement to punitive damages, in the absence of a motion to set aside the award, plaintiff was entitled to a proper assessment of damages. We conclude that the trial court's award of a nominal amount, based on its obvious disagreement with the jury's verdict, is erroneous, and thus we remand the matter to the trial court for a new determination on this issue.
Plaintiff's second assignment of error is sustained.
Under the fourth assignment of error, plaintiff asserts that the trial court erred in granting a directed verdict in favor of defendant Jacqueline Masters. As noted under the facts, Masters is the office manager and treasurer of Chase Motors. Plaintiff points to the fact that Masters wrote two of the checks at issue and that she participated in making the stop payment orders on those checks. Plaintiff maintains that, although Renaut was the main perpetrator of the fraud, Masters was a knowing and willing participant in those activities.
At trial, plaintiff argued that there was sufficient circumstantial evidence to imply that Masters had knowledge that the checks she wrote were not backed by sufficient funds. Plaintiff called Masters to testify as on cross-examination. During her testimony, Masters related that Renaut controlled the Chase Motors' checkbook and that, at any given time, she was unaware of the balance of the checkbook. Renaut often put money into the account without Masters' knowledge. The testimony indicated that Masters would write a check when Renaut instructed her to do so, and that she did not necessarily know whether those checks were covered by sufficient funds. Masters testified that she was not aware whether money was regularly transferred between the checking accounts of Sommer Automotive and Chase Motors. She was also unaware whether Sommer Automotive loaned money to Chase Motors. Masters stated that she did not handle the bank statements for the Chase Motors checking account.
Regarding plaintiff's Exhibit No. 1, the check from Chase Motors to Krieger Ford in the amount of $90,700, dated September 23, 1996, Masters testified that she had no knowledge of the balance of the checking account on the date she wrote the check. She also denied any knowledge of the balance of the Chase Motors checking account on the date the second check was issued to Krieger Ford in the amount of $210,500. Masters stated that she had no knowledge, on October 1, 1996, that Chase Motors had received notice from Bank One that a check issued to Modern Finance had been rejected for insufficient funds. She did, however, at the request of Renaut, contact Bank One to request that the bank stop payment on the two checks written to plaintiff.
Renaut corroborated Masters' testimony regarding the extent of her knowledge of the company's checking account. Renaut testified that Masters "wouldn't have an idea" of the amount of money in the checking account. (Tr. 262.) Renaut stated that he would often deposit money but "forget to bring the deposit slip in, not mark it in the book * * *. I did that for years." (Tr. 267.) He also testified that he personally took care of the checking statements, and that Masters "wouldn't see the checking statement or those statements that came." (Tr. 268.)
Upon review, we find no error by the trial court in granting a directed verdict in favor of Masters. While Masters signed checks, she did so under the authorization and direction of Renaut. The uncontroverted evidence shows that Renaut controlled the checkbook statements and that he was the only one with the ability to ascertain the actual balance at any given time. The evidence simply fails to show that Masters knew the checks she wrote would not be paid, or that she acted with intent to defraud plaintiff. We also note that there was no evidence that Masters personally benefited from any misrepresentations.
Based upon the foregoing, plaintiff's fourth assignment of error is overruled.
Under the fifth assignment of error, plaintiff argues that the trial court erred in directing a verdict in favor of all defendants on plaintiff's RICO claim. Count six of plaintiff's amended complaint set forth the allegation that "[d]efendant Renaut has wrongful[ly], maliciously and intentionally conspired with and through his total control and direction of Defendants Chase Motors, Inc. and Sommer Automotive Services, Inc., through a pattern of corrupt activity * * * in violation of Ohio Revised Code § 2923.23 and § 2923.34 * * *."
"R.C. 2923.34(B) permits certain individuals to institute civil proceedings for violations of R.C. 2923.32."Woodyard v. Jim Walter Homes, Inc. (Nov. 5, 1997), Lawrence App. Nos. 96 CA 28 96 CA 12, unreported. R.C. 2923.34(B) states:
 Any person who is injured or threatened with injury by a violation of section 2923.32 of the Revised Code may institute a civil proceeding in an appropriate court seeking relief from any person whose conduct violated or allegedly violated section 2923.32 of the Revised Code or who conspired or allegedly conspired to violate that section, except that the pattern of corrupt activity alleged by an injured person or person threatened with injury shall include at least one incident other than a violation of division (A)(1) or (2) of section 1707.042
[1707.04.2] or division (B), (C)(4), (D), (E), or (F) of section 1707.44 of the Revised Code, of 18 U.S.C. § 1341, 18 U.S.C. § 1343, 18 U.S.C. § 2314, or any other offense involving fraud in the sale of securities.
R.C. 2923.32(A)(1) states in part that "[n]o person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity * * *." Thus, the statute requires a "pattern of corrupt activity," which is defined under R.C. 2923.31(E) as "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event."
At trial, the trial court granted defendants' motion for directed verdict as to plaintiff's RICO claim based in part on the court's determination that plaintiff failed to show a "pattern of corrupt activity." We find no error in the court's determination.
Plaintiff's basic contention is that the passing of the three bad checks established a pattern of corrupt activity. We disagree. The fact that three separate checks were written does not, in itself, establish the "pattern" requirement under the statute. At issue in this case is a single transaction, i.e., the sale by plaintiff of ninety-nine vehicles to Chase Motors. While the three checks were issued to facilitate the transaction, we conclude that these acts are so closely related to each other and connected in time and place that they constitute a single event.
In a similar context, federal courts have held that "a single transaction which involves only one victim and takes place over a short period of time does not constitute the pattern of racketeering required for long-term criminal activity under a RICO claim." Terry A. Lambert Plumbing v.Western Sec. Bank (C.A.8, 1991), 934 F.2d 976, 981. See, also, Schultz v. Rhode Island Hosp. Trust Nat. Bank (C.A.1, 1996), 94 F.3d 721, 731 ("a `single episode' of criminal behavior, even if it involves the commission of multiple related acts, does not constitute a `pattern'"); Tarr v. Credit Suisse AssetManagement, Inc. (E.D.N.Y. 1997), 958 F. Supp. 785, 800 (a series of predicate acts that, together constitute a single scheme to accomplish one discrete goal, and directed at one victim over a short period of time, does not constitute a pattern of corrupt activity).
Finally, we note that there was no evidence of Chase Motors' involvement in similar activity in the past; plaintiff had not had trouble receiving payment from Chase Motors in other dealings prior to the transaction at issue. The Ohio Supreme Court has recognized that, in general, "R.C.2923.32 is based on the federal RICO statute." State v.Schlosser (1997), 79 Ohio St.3d 329, 332. It has been noted that the target of the federal RICO statute is not sporadic activity, but rather "the threat of continuing activity." State v. Thrower
(1989), 62 Ohio App.3d 359, 374. In the present case, we decline to find that one isolated transaction involving the sale of the subject vehicles satisfies the statutory requirement of a pattern of racketeering activity.
Plaintiff's fifth assignment of error is without merit and is overruled.
Under the sixth assignment of error, plaintiff argues that the trial court erred in refusing to admit certain evidence that plaintiff contends was relevant to show defendant Renaut's "alter ego" control over the corporate activities of Chase Motors and Sommer Automotive as it related to the fraud and RICO claims. Based upon this court's prior disposition of the third and fifth assignments, we find that the sixth assignment of error is rendered moot.
Under the seventh assignment of error, plaintiff contends that the trial court erred in failing to order monetary sanctions against defendants for having been found in contempt related to the court's issuance of a temporary restraining order. The record indicates that the trial court issued a temporary restraining order on October 18, 1996, restraining defendant from "selling * * * transferring * * * or otherwise doing anything to effect the legal title" of the subject automobiles. On October 28, 1996, plaintiff filed a motion for contempt, asserting that Chase Motors had failed to abide by the court's order by transferring titles to three vehicles on October 21 or October 22, 1996. By decision and entry filed December 19, 1996, the trial court overruled plaintiff's motion.
Plaintiff subsequently filed a motion for reconsideration with the trial court of its decision overruling the motion for contempt. In response, defendants argued that they should not be held in contempt because the automobiles at issue were sold prior to issuance of the temporary restraining order; defendants also contended that the titles were transferred because the cars had already been sold. On March 6, 1997, the trial court granted plaintiff's motion for reconsideration and found defendants to be in contempt of court. Specifically, the court held that defendants were not entitled to ignore a temporary restraining order simply because "the Attorney General's office is demanding transfer." The trial court held in abeyance any determination of sanctions pending the outcome of the case.
By entry filed July 22, 1998, the trial court denied plaintiff's motion for sanctions. In that entry, the court held that "[a]fter having reviewed all of the pleadings, the entire case file, and the evidence presented at trial, the Court finds that * * * expense money based on the Defendant's temporary restraining order violations is not warranted."
In Johnson v. Morris (Dec. 13, 1993), Ross App. No. 93 CA 1969, unreported, the court noted that "[c]ontempt of court has been defined as disobedience of an order of a court. It is conduct which brings the administration of justice into disrespect, or which tends to embarrass, impede or obstruct a court in the performance of its functions." The court further noted that, because "the primary interest in a contempt proceeding is the authority of and proper functioning of the court, great reliance should be placed upon the discretion of the trial judge." Id.
Similarly, it has been held that, where contempt proceedings are invoked solely by the person aggrieved by disobedience of the court's orders, the refusal to punish for contempt "is largely, if not wholly, within the discretion of the trial court, and one who unsuccessfully invokes such punishment for another can complain, if at all, only for the abuse of the court's discretion in refusing to so punish." Lentz v. Lentz (1924),19 Ohio App. 329, paragraph one of the syllabus.
In reviewing plaintiff's contention regarding the trial court's decision not to award expenses for the contempt, the issue before this court is not whether we would have ruled differently as to an award. Here, the court found, based on the totality of the evidence presented, that an award of sanctions was not warranted. Given the trial court's broad discretion in deciding whether to award sanctions against a contemnor, we will not substitute our judgment for that of the trial court under these circumstances.
Accordingly, plaintiff's seventh assignment of error is overruled.
Based upon the foregoing, plaintiff's first, fourth, fifth, and seventh assignments are overruled, plaintiff's sixth assignment of error is rendered moot, plaintiff's second and third assignments of error are sustained, the judgment of the trial court is affirmed in part and reversed in part and this matter is remanded to the trial court for further proceedings in accordance with law and consistent with this opinion.
Judgment affirmed in part, reversed in part, and cause remanded.
PETREE and KENNEDY, JJ., concur.
[1] Peter Renaut testified at trial that he sold his shares of stock in Sommer Automotive, Inc. to his father and brother in January of 1996.
 OPINIONS AND DECISIONS